523 P.2d 496

**RAMADA INNS, INC., a Delaware corporation, qualified to do business in Arizona, Appellant,**

v.

**SALT RIVER VALLEY WATER USERS' ASSOCIATION, an Arizona corporation, Appellee.**

**No. 11472.**

Supreme Court of Arizona,
In Banc.

June 13, 1974.

Burch, Cracchiolo, Levie, Guyer & Weyl by Frank Haze Burch, Joseph L. Moore and C. Michael Pierce, Phoenix, for appellant.

Jennings, Strouss & Salmon by Nicholas Udall and M. Byron Lewis, Phoenix, for appellee.

HOLOHAN, Justice.

Ramada Inns, Inc. is the owner and operator of a resort hotel in Scottsdale, Arizona, known as the Safari Hotel. In September 1970 and June 1972 the Safari Hotel was damaged by flood waters, and Ramada filed an action in the Superior Court against the Salt River Valley Water Users' Association and others for the amount of damages caused by the flooding.

The complaint of Ramada contained numerous counts alleging liability based on theories of strict liability, negligence, trespass and inverse eminent domain. The Water Users filed a motion to dismiss various counts of the complaint, and the Superior Court granted the motion as to the counts based on strict liability and inverse eminent domain. The court granted a judgment of dismissal as to the foregoing counts, and, pursuant to Rule 54(b), 16 A.R.S., the judgment was entered to be effective without awaiting the trial and determination of the remaining counts. From the judgment Ramada appealed. The parties moved to have the appeal transferred to this Court, and because of the importance of the issues involved, the motion for transfer was granted.

Although Ramada suggests three questions on appeal, there is only one central issue: Should the Water Users be held strictly liable for damage caused by the flooding or diversion of water by the Arizona Canal?

A brief review of the history of the Arizona Canal is necessary for an understanding of the case. Entering the Salt River Valley from the northeast is the Salt River, which river is subject to great variations in water flow throughout the year. Just prior to its entrance into the Valley the Salt is joined by the Verde River and the two empty into the Gila River located in the southwestern portion of the Valley. On both rivers several dams have been constructed to retain and store water flowing down the rivers in high water periods for later release in times of low water or drought. Because of the sparse rainfall it was necessary to develop a means of bringing water to the lands of the Valley for cultivation. A system of canals was constructed to carry water to various parts of the Valley. At least as early as 1867 the Salt River Valley Canal was built to service the central part of the Valley. Construction on the Arizona Canal was begun in 1883. This most northerly of all the canals has its beginning at Granite Reef Dam on the Salt River and runs in a generally northwesterly direction, some fifty miles, to a point on the New River. Originally it was twenty feet wide and five feet deep, but has been enlarged over the years. It is now what may be termed an elevated, open earthen-banked canal.

At the time of its inception the Arizona Canal carried water through relatively unpopulated rural areas, but the metropolitan area of Phoenix grew and the City of Scottsdale came into existence so that the canal now runs through highly populated residential and commercial districts in Scottsdale and Phoenix. For further reference to the history of the Salt River Valley Canal System see Judge Kent's decision (Kent decree) in Hurley v. Abbott, No. 4564, District Court, 3rd Judicial District, Territory of Arizona (March 1, 1910) and Clausen v. Salt River Valley Water Users' Association, 59 Ariz. 71, 123 P.2d 172 (1942).

Now, more than ninety years after its construction the canal runs by the intersection of Scottsdale Road and Camelback Road, a busy intersection; and to the north of the intersection lies the Safari Hotel. It is at that point that waters allegedly overflowed from the banks of the Arizona Canal or waters were diverted from their natural runoff by the elevated banks of the canal and caused extensive damage to the hotel on September 6, 1970 and again on June 22, 1972.

Ramada urges that the canal has become, because of the increase in population, an inherently dangerous instrumentality and subjects its owners to strict liability. Rylands v. Fletcher, L.R. 3 H.L. 330 (1868); McLane v. Northwest Natural Gas Company, 255 Or. 324, 467 P.2d 635 (1970). Ramada argues that strict liability is imposed by law for reasons of public policy; that what was once a useful and necessary enterprise has now become an activity presenting extraordinary risks and hazards; that the damage caused by the enterprise should be paid for without the necessity of proving negligence and the loss spread over the users of the system.

The Water Users contend that the long history and existence of the canal system have made it such a part of community and topography of the land that it has taken on many of the characteristics of a natural watercourse; further the economic need for the canal system remains as much today as in times past. Finally, the Water Users point out that the decisions of this Court have consistently held that it is not an insurer against damage from its irrigation system but is only required to exercise reasonable care in constructing, operating and maintaining it.

A number of cases have considered the nature of artificial waterways which by reason of their history and permanent condition have been held to be similar to natural watercourses. Saelens v. Pollentier, 7 Ill.2d 556, 561, 131 N.E.2d 479 (1956), citing 56 Am.Jur., Waters § 151 (1947), states that under some circumstances an artificial ditch may take on the characteristics and burdens of a natural watercourse. Three criteria must be considered.

". . . (1) whether the way or stream is temporary or permanent; (2) the circumstances under which it was created; and, (3) the mode in which it has been used and enjoyed. Where the way is of a permanent character, and is created under circumstances indicating an intention that it shall become permanent, and it has been used consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural watercourse, and treated, so far as the rules of law and the rights of the public or of individuals are concerned, as if it were of natural origin." 56 Am.Jur. at 622.

In Chowchilla Farms Inc. v. Martin, 219 Cal. 1, 17, 25 P.2d 435 (1933) and Weck v. Los Angeles County Flood Control District, 104 Cal.App.2d 599, 611, 232 P.2d 293 (1951) the Court quotes with approval Wiel's treatise on water rights, in part:

" 'There is further an established principle that by lapse of time an artificial watercourse may come to be regarded as equivalent to a natural one. These cases do not depend exactly upon prescription, for, as above shown, prescription, properly speaking, cannot run in favor of lower parties upon a flow as against parties higher up. They rest rather upon what some of the cases call ordinary dedication to a class of public which, in the course of time, has established itself upon the basis of the artificial condition. Where the creator of the artificial condition intended it to be *permanent*, and a community of landowners * * * has been allowed to adjust itself to the presence and existence of the * * * artificial condition, acting upon the supposition of its continuance, and this has proceeded for a long time beyond the prescriptive period, the new condition will be regarded as though it were a natural one, its artificial origin being then disregarded by the law as it has been by the community.' " 1 Wiel, Water Rights § 60 (3d edition, 1911).

The Arizona Canal meets all the requirements to be considered at this time a natural watercourse flowing through the Salt River Valley. By this we mean that it has developed the characteristics of a natural watercourse, but this does not mean that the water belongs to the public as do all wholly natural waters (A.R.S. § 45–101), nor do we imply that the Water Users are relieved from the duty to maintain and repair the canal (A.R.S. §§ 45–204 and 45–205).

Ramada urges that irrespective of the nature of the canal public policy suggests that a loss, when neither side is at fault, should be placed upon those parties best able to bear the loss. Ramada contends that the Water Users may spread the loss by passing the cost on to the ultimate consumers who receive the benefit of the activity which created the loss. Merely showing a loss does not justify transferring the loss, and the reasons justifying the transferring of the loss must of necessity return to the nature and utility of the activity conducted by the Water Users.

Ramada argues that the nature of the irrigation system is such that at this time it is a dangerous activity, and any loss occasioned by the existence of that activity should be borne by the Water Users.

The necessity for the continued existence of the irrigation system is not challenged by Ramada. That system remains today as it did many years ago "indispensable for the maintenance of life and prosperity." Salladay v. Old Dominion Copper Mining Company, 12 Ariz. 124, 129, 100 P. 441, 442 (1909). The passage of ninety years has seen the continued use and dependence upon the system to such an extent that it is considered a natural part of the surroundings; its presence and existence has been accommodated and adjusted to by the community. In the case of Ramada, the high banks of the canal stop the flow of surface water from north to south causing difficulty to Ramada in the infrequent occasions of heavy rains, but to the landowners south of the canal in the same area it is a blessing because the canal does act as a buffer for the flow of surface waters. The canal is not a flood control device and was never intended as such, but, to the southern landowners in the area it acts somewhat in that capacity. Needless to say, any change in the present height of the canal could cause serious problems to those landowners who have established their homes and businesses based on the assumption that the condition of the canal as it has existed through the years will remain the same.

By reason of the continued utility and necessity of the Arizona Canal we see no reason to impose strict liability upon its maintenance and existence. In the choice of location near the canal the landowners are necessarily aware of the nature of the canal, for it is plain for all to see. Those landowners must assume the burdens occasioned by locating near the canal the same as are occasioned by a landowner locating by any natural feature of land, and any loss occasioned by such choice of location, and not involving the element of fault, should not be passed on to others but must be borne by the landowner.

Judgment affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.