113 Ariz. 190 (1976)
549 P.2d 162
SALT RIVER VALLEY WATER USERS' ASSOCIATION, an Arizona Corporation, Appellant,
v.
George and Caroll GIGLIO, Alvin and Shirley Brassow, Wallace and Gladys Ewald, et al., Coe and Van Loo Consulting Engineers, Inc., and Hallcraft Homes, Inc., an Arizona Corporation, Appellees. George and Caroll GIGLIO, Alvin and Shirley Brassow, Wallace and Gladys Ewald, et al., Cross-Appellants,
v.
SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, Cross-Appellee.
No. 12207.
Supreme Court of Arizona, In Banc.
April 16, 1976.
Rehearing Denied May 18, 1976.
*191 Jennings, Strouss & Salmon, by Nicholas Udall and M. Byron Lewis, Phoenix, for appellant and cross-appellee.
Robertson, Molloy, Fickett & Jones, P.C., by John F. Molloy, Tucson, and Burton J. Kinerk, Tucson, Osmond A. Burton, Jr. Scottsdale, for appellees and cross-appellants Giglio et ux, et al.
O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Killingsworth and Harding B. Cure, Phoenix, and Gust, Rosenfeld, Divelbess & Henderson, by James M. Koontz, Phoenix, for appellees Hallcraft Homes and Coe and Van Loo Consulting Engineers, Inc.
CAMERON, Chief Justice.
This is an appeal by defendant, Salt River Valley Water Users' Association, from a jury verdict and judgment on behalf of *192 the 219 plaintiffs for damages, compensatory and punitive, totaling $1,154,345.45, sustained as a result of the flooding of their property located south of the Arizona Canal and west of Pima Road in Scottsdale, Arizona.
We must answer the following questions:
1. Do the Arizona courts have jurisdiction over the defendant Salt River Valley Water Users' Association and the subject matter of this action?
2. Does the Salt River Valley Water Users' Association have flood control responsibilities in the operation of the Salt River Project?
3. Was there sufficient evidence of negligence to go to the jury?
4. Was there sufficient evidence of recklessness to submit the issue of punitive damages to the jury?
5. Are the irrigation canals of the Salt River Project to be treated as "natural watercourses" for the purposes of liability to nearby landowners by the operator of the canals?
6. Was there any reversible error in the admission and rejection of evidence and in charging the jury?
7. Did the trial court err in dismissing the defendant Salt River Valley Water Users' Association's cross-claims against Hallcraft and Coe & Van Loo?
In 1867 when Phoenix was a hay camp for the United States Cavalry at Fort McDowell, Jack Swilling organized the Swilling Ditch Company. The company completed its first canal, the Salt River Valley Canal, in March, 1868, and harvested a spring crop irrigated by water from the canal. More settlers migrated to the Valley, and by 1888 more than 100,000 acres were under cultivation. New canals, some built upon the original Hohokam canal sites constructed in 300 to 200 B.C., were built to carry water to the freshly-cleared farmland. The Tempe Canal was built in 1870; San Francisco Canal, 1871; Utah Canal, 1877; Grand Canal, 1878; Mesa Canal, 1879; Arizona Canal, 1883; and Highland Canal, 1888.
The Hansbrough-Newlands Act which came to be known as the Federal Reclamation Act became law on 17 June 1902. The Salt River Valley Water Users' Association was incorporated under the laws of the Territory of Arizona on 9 February 1903 for the purpose of negotiating with the United States to provide an adequate supply of irrigation water for the benefit of the approximately 4,800 individual landowners living in the Valley at the time. From its inception the Salt River Valley Water Users' Association has been a private Arizona corporation operated for the benefit of its shareholders who were landowners desirous of receiving irrigation water from the Salt River Project and who had in writing agreed to have their land bound by the "* * * articles of incorporation and the rules and regulations of its by-laws. * * *" Orme v. Salt River Valley Water Users' Association, 25 Ariz. 324, 330, 217 P. 935, 937 (1923).
Between 1904 and 1917, the Salt River Project was under the operation and control of the United States Reclamation Service as a part of the Salt River Reclamation Project. During this time the United States government acquired ownership of the water distribution system of the Salt River Project.
Members of the Association became concerned over the rising cost of the Project and the manner in which the government was operating it. After lengthy negotiations a contract between the United States government and the Association was signed on 6 September 1917, in which the government agreed to turn over to the Association the care, operation and maintenance of the Salt River Project consisting of the Roosevelt Dam, irrigation canals, laterals, ditches, and various other properties as well as all of the irrigation facilities. The Association took over the operation of the canal system on 1 November 1917, and from that time has assumed full *193 responsibility for its care, operation, and management:
"* * * The Association entered into contracts with the Federal Government, which provided substantially as follows: The government advanced the funds necessary for the building of the Roosevelt reservoir and later the extension of the distributing irrigation system of the valley, and retained and still retains the legal title thereto, although the actual operation of the system has long since been turned over to the association. The association obligated itself to repay to the government, within a stipulated period of time, the amount of money expended "by the latter for the irrigation system, together with the interest thereon. * * *" Reichenberger v. Salt River Project, etc., 50 Ariz. 144, 146-147, 70 P.2d 452, 453 (1937).
In 1937 the Association transferred all its property to the Salt River Project Agricultural Improvement and Power District which District had the status of a municipal corporation for the purposes of bonding. Reichenberger v. Salt River Project, etc., supra, 50 Ariz. at 149-151, 70 P.2d at 454-455.
The Association, as presently constituted and operated, is a private corporation operated for the benefit of its shareholders and in such capacity is a service and operating company of the Salt River Project. The District, on the other hand, has been described as follows:
"The District's exact status escapes a simple definition. It is not a `public service corporation' as set forth in the Constitution, Art. 15, § 2, A.R.S. and is not subject to regulation by the corporation commission as to its services and rates. (citation omitted) It is denominated a political subdivision of the state and entitled to all the immunities and benefits granted to municipalities by the Constitution or statutes, Constitution, Art. 13, § 7 [Amendment of 1940]. Yet as a political subdivision its powers are obviously limited to the purposes justifying its political existence. The privileges and immunities granted extend only so far as they have a legitimate relationship to the legal objectives for which the District is organized. * * *" City of Mesa v. Salt River Project Agr. Imp. & P. Dist., 92 Ariz. 91, 97, 373 P.2d 722, 726 (1962).
Both the Association and the District appear to hold themselves out as the "Salt River Project," but it does not appear to be a separate entity. In this opinion when we refer to the "Salt River Project" or simply the "Project," we will be concerned with the actual physical irrigation system operated by the Association. The Salt River Valley Water Users' Association will be referred to as the "Association" and the Salt River Project Agricultural Improvement and Power District as the "District."
The Arizona Canal is the most northerly of all the Project canals. It begins at Granite Reef Dam on the Salt River and runs approximately 50 miles to a point on the New River. It runs in a west to northwesterly direction on the north side of the Salt River and somewhat parallel to the Salt River. When the Arizona Canal was built in 1883, it carried water through relatively unpopulated rural areas, but the metropolitan area of Phoenix grew and the City of Scottsdale came into existence so that today the canal runs through highly populated residential and commercial districts in Scottsdale and Phoenix. The canal is an open earthenbanked canal somewhat elevated above the land on each side with the south bank slightly higher than the north bank.
An irrigation system is constructed with its greatest capacity at the head of the canal where the water enters, and it diminishes as water deliveries are made so that the water can be contained in a smaller channel as it nears the end of the system. At the head of the Arizona Canal, Granite Reef Dam, the canal has a capacity of 1,900 cubic feet per second. The canal narrows or pinches in as it moves westward through Scottsdale and Phoenix. It *194 reduces to 1,125 cubic feet per second at 64th Street and continues to narrow to about 300 second feet at the end of the system.
On 5 September 1970, a severe rainstorm hit the central Arizona area. In parts of Phoenix and Scottsdale four to five inches of rain fell within a period of 24 hours. It was determined that this heavy precipitation was at least of the magnitude of a 100 year storm. A 100 year storm is a storm of such severity that it is calculated it will occur once every 100 years. Whenever there is a severe rainstorm in the Phoenix area, there is a substantial surface flow or runoff from the mountains surrounding the Valley. The Arizona Canal is situated between the McDowell Mountains to the north and the bed of the Salt River to the south. The canal therefore intersects some alluvial fans emanating from the McDowell Mountains. Thus, any water from the McDowell Mountains will, in following its natural course toward the Salt River, flow toward the Arizona Canal. The canal then acts as an elongated dam and there is ponding to the north of the canal.
The plaintiffs in this action are the owners of 219 dwellings lying to the west of Pima Road east of Granite Reef Road and between 1/3 and 2 1/3 miles south of the Arizona Canal. All of these homes are in that portion of Scottsdale referred to as the Indian Bend Wash. In other words, plaintiffs' homes are in the path of a natural drainageway from the mountains to the Salt River.
The testimony indicates that water was flowing into the canal from the north in the early afternoon of 5 September. As a result of an overload of water in the canal, two breaches occurred in the south bank of the Arizona Canal. The first breach occurred about 8:00 p.m. between the Pima Road Bridge and the demossing bridge, a device used for the maintenance and cleaning of the canal. It was approximately 40 feet in width and 5 to 6 feet in depth. Richard L. Brown, street and traffic superintendent for the City of Scottsdale, was an eyewitness to this breach in the south bank of the canal. He testified:
"* * * I saw water coming out of a hole, irregular-shaped hole, approximately 15 to 20 inches in diameter close to the toe of the slope, bottom of the bank and I had no more than observed this, and I just squatted down to take a closer look at it, when it sounded like thunder, and there was a whole section of the canal went out. And I approximate that to be about 30 to 40 feet of the canal bank just gave way and went right out into this area here."
The second break was about 20 feet in width and occurred less than one-half mile east of the first break. The time of this "second" breach was not determined, but it was during the early evening of 5 September.
Water flowed through the breaches in a southerly direction across Pima Road and flooded the homes of the plaintiffs, part of a Hallcraft subdivision which had been constructed south of the canal. Flooding of plaintiffs' homes occurred between 8:30 and 11:00 that evening; the further south the location of the homes the later it was flooded. Most of the homes had sunken living rooms. When the flood waters, which contained silt, manure, and debris, entered the homes, the sunken living rooms were flooded with as much as 20 inches of water and the other rooms in the houses were filed with between 2 and 4 inches of water.
A class action was originally filed but abandoned in favor of a suit by 219 joint plaintiffs. The third amended complaint included as defendants, in addition to the Association, the City of Scottsdale, Coe & Van Loo Consulting, Inc. (architects), Hallcraft Homes, and the District as defendants. After various motions both before and during trial, these parties were dismissed, and there remained at the time of judgment only the plaintiffs, homeowners, and the defendant Association.
A jury trial limited to the question of liability and punitive damages was commenced *195 on 15 November 1973. The jury returned a verdict on 8 February 1974 in favor of the plaintiffs and against the Association on the question of liability and the issue of punitive damages, and fixed the amount of punitive damages in the sum of $434,000.
As to the issue of actual damages, 10 damage claims were tried to the jury beginning 21 February 1974 and ending 1 March 1974. The results of these damage claims were then used by counsel to determine the amount of damages for all of the remaining plaintiffs except one. A written judgment was entered against the Association, including punitive damages, in the amount of $1,154,345.45 on 23 October 1974. On 4 November 1974, the Association's motion for judgment notwithstanding the verdict and motion for new trial was denied. From this judgment and the denial of the motion, the Association perfected appeals against the plaintiffs as well as an appeal from the dismissal of the Association's cross-claim against Hallcraft and Coe & Van Loo.
DID THE TRIAL COURT HAVE JURISDICTION OVER THE NECESSARY PARTIES AND THE SUBJECT MATTER OF THIS ACTION?
By various motions the Association has raised and put in issue both in this court and the trial court, the question as to whether we have jurisdiction over the Association or the subject matter. In essence, the Association contends that the Project is owned by the United States and the Association is merely an agent of the United States in the operation of the Project and that as an agent of the United States government, it is immune from suit for its acts. We disagree.
A party asserting an agency relationship has the burden of proving it. Independent Gin Co., Inc. v. Parker, 19 Ariz. App. 413, 508 P.2d 78 (1973). Agency is a question of intent and generally the agent must be acting under the control of the principal and for the principal's benefit. Independent Gin Co., Inc. v. Parker, supra. We believe that the intentions of the United States and the Association can be derived from a reading of the contracts between them. The 25 June 1904 contract contained the following provisions:
"5. The said Salt River Valley Water Users' Association agrees that it will promptly collect or require prompt payment in such manner as the Secretary of the Interior may direct, and hereby guarantees the payments, for that part of the cost of irrigation works, which shall be apportioned by the Secretary of the Interior to its shareholders, and promptly pay the sums collected by it to the Receiver of the local land office for the district in which said lands are situate; that it will promptly employ the means provided and authorized by the said Articles of Incorporation for the enforcement of such collections and will not change, alter or amend its Articles of Incorporation in any manner whereby such means of collection, or the lien given to it by the shareholders to secure the payment thereof or of any assessments contemplated or authorized thereby, shall be impaired, diminished, or rendered less effective, without the consent of the Secretary of the Interior.
"6. The United States shall in no manner be responsible for the sums collected by said Association until they have been paid into the hands of the receiver of the local land office, as provided by the law, and in accordance with such regulations as may be prescribed by the Secretary of the Interior.
"7. That for the purpose of enforcing said collections, the Association will adopt and enforce proper By-Laws, subject to the approval of the Secretary of the Interior, and not change them so as to in anywise impair their efficiency for said purpose, and will otherwise do any and all things it is authorized and empowered to do in the premises."
Later a supplementary contract dated 6 September 1917 was signed by the United *196 States and the Association in which the United States agreed to:
"* * * turn over to and vest in the said Association, the care, operation and maintenance of the irrigations works known as the Salt River Project, situate in the counties of Gila, Pinal and Maricopa, consisting generally of the Roosevelt Dam, the Granite Reef Dam, irrigation canals, laterals and ditches, and other conduits, gates, pipes, power plants, power houses, buildings and other structures of every kind, transmission, telegraph and telephone lines, wires, pumps, machinery, tools and appliances and all property of whatsoever kind, real, personal or mixed, appurtenant to or used, or constructed or otherwise acquired to be used, in connection with the said Salt River Project, wheresoever said property may be situated, and as well, all water rights and franchises, and rights to the storage, diversion and use of water for irrigation or other purposes, water power, electric power and power privileges, with such right of possession of all thereof, as shall be necessary or convenient for the care, operation and maintenance of said project by said Association, as hereinafter provided. And said Association shall from the time of the taking over of the care, operation and maintenance of said project thenceforward have and receive to its own use and benefit, all the rents, issues, profits, revenue and income, including all income from power and power privileges growing out of or arising from the operation and maintenance of the project and every part thereof by it.
"Third: The Association agrees to accept the transfer to it of the care, operation and maintenance of said project, and that it will care for, operate and maintain the same and every essential part thereof in full compliance with law and the provisions of this agreement, * * *.
"That it will promptly pay all such cost of the care, operation and maintenance of the project as it is incurred. That it will make no substantial change in any of said works, without first having obtained the consent thereto, to be expressed in writing, of the Secretary of the Interior. It may, however, construct additional works at its own cost without the necessity of procuring the assent of the Secretary of the Interior of the United States, "provided that such additional works shall not in any wise impair or diminish the present efficiency or adequacy of the project for the purposes for which it has been designed, constructed and acquired.
"Fourth: The Association shall repay to the United States the cost of the construction, and acquisition otherwise, of said project promptly and without default.
* * * * * *
"Sixth: The Association shall use all practical methods to insure the economical and beneficial use of irrigation water. It shall also hold the United States harmless as to any damages which may accrue to other land or property either within or without the reservoir district growing out of the care, operation and maintenance of the project by the Association.
* * * * * *
"Eighth: The Association shall maintain all the works turned over to it under the provisions of this agreement in proper operating condition and make proper delivery of irrigating water to each farm entitled thereto, or at least as near to the farm as the United States is now delivering such water."
We do not believe from these documents that there is a principal-agent relationship created between the United States and the Association. Nowhere in these contracts do we find that the Association is responsible to the United States for the day to day operation of the Project. Nowhere do we find that the Association, in the operation of the Project, is acting under the control of the United States and for the *197 benefit of the United States. The contracts more nearly reflect a landlord-tenant relationship rather than an agency relationship.
The Association, however, points to the language in the contract between the Association and the District and approved by the United States as proof of their agency. In the contract between the Association and the District dated 22 March 1937, it was provided:
"WHEREAS, the Association, pursuant to the purposes expressed in its Articles of Incorporation, by contract with the Secretary of the Interior acting for the United States, dated June 25, 1904, undertook and agreed, as agent for the United States, to collect from the owners of lands within the Association and to pay over to the United States installments of principal and interest due the United States for the construction and operation of the works to be constructed and operated by the United States in connection with the said Salt River Project; and by a second contract with the Secretary of the Interior of the United States, dated September 6, 1917, and contracts supplementary thereto, undertook as agent for the United States the care, operation, completion, extension, improvement and maintenance of the said storage dams, * * *."
However, in approving the contract, the United States stated:
"The approval, however, is not an approval of the recitals of legal inferences based upon the contracts dated July 25, 1904, September 7, 1917, and November 26, 1935, and contracts amending or supplementing the same."
The Association may not, by contract with the District, bootstrap itself into a legal relationship with the United States which does not exist. We find no agency relationship as a result of this contract.
Even assuming, however, that the Association is an agent of the United States, we would still disagree as to the immunity of the Association from suit. Section 347 Restatement of the Law Second, Agency 2d (1958) states:
"Immunities and Standard of Care of Principal
"(1) An agent does not have the immunities of his principal although acting at the direction of the principal."
And the United States Supreme Court has stated:
"* * * an instrumentality of Government he [it] might be and for the greatest ends, but the agent, because he [it] is agent, does not cease to be answerable for his acts. (citations omitted) * * *
"* * * The plaintiffs are not suing the United States but the Fleet Corporation, and if its act was unlawful, even if they might have sued the United States, they are not cut off from a remedy against the agent that did the wrongful act. In general the United States cannot be sued for a tort, but its immunity does not extend to those that acted in its name. * * *" Sloan Shipyards Corp. v. United States Shipping Board, 258 U.S. 549, 567-568, 42 S.Ct. 386, 388, 66 L.Ed.2d 762, 768 (1922).
Finally, the appellant contends that the United States is an indispensable party based upon our holding in City of Mesa v. Salt River Project, 101 Ariz. 74, 416 P.2d 187 (1966). That case concerned a suit to condemn land owned by the United States and we held that the United States was an indispensable party. We stated, however:
"This case only involves the jurisdiction of the state courts when the United States government has an interest in property sought to be condemned. We have recognized the right of the Project to bring suit and they have brought suit in many other instances." City of Mesa v. Salt River Project Agr. Imp. & P. Dist., 101 Ariz. at 84, 416 P.2d at 197 (1966).
This is not a suit to condemn land of the United States, and any judgment that might be obtained against the Association *198 would be paid by the Association and not the United States:
"The test, therefore, in the determination of whether an action is one against the United States is not determined by the named parties but is determined by the relief sought and the results of any judgment or decree which might be entered pursuant thereto. If the effect of granting relief against the officer named as a defendant will necessarily result in the same relief against the sovereign then the United States is a necessary party and absent its consent the action will not lie. * * *" Ogden River Water Users' Ass'n v. Weber Basin W. Cons., 238 F.2d 936, 941 (10th Cir.1956).
DOES THE ASSOCIATION HAVE FLOOD CONTROL RESPONSIBILITIES?
Throughout the trial, the Association objected to any mention of flood control duties. For example:
"Q (By Mr. Molloy) What is the engineering problem as far as the present situation is concerned, Mr. Wheeler?
"A Well, it's an inadequate flood control device.
"MR. LEWIS: Objection, Your Honor, hold it, Mr. Wheeler. The same point we keep coming back to day in and day out. Everybody wants to regard this canal as a flood control device. That makes a legal assumption; doesn't make it a flood control device, because they want to assume that it is.
"Q (By Mr. Molloy) Your Honor, he has interrupted a perfectly proper question. The witness is trying to explain something, and because he uses these magic words that Mr. Lewis abhors, I don't see any reason to strike his testimony. He is trying to explain why the present situation is very difficult to deal with.
"THE COURT: He may answer."
The Association also proposed the following instruction:
"Flood control responsibility is comprehensively covered by Arizona legislative enactments which provide for the organization of flood control districts. Neither the SALT RIVER VALLEY WATER USERS' ASSOCIATION nor the SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT has any flood control responsibilities."
The trial court refused this instruction but gave the following instruction:
"The Salt River Water Users' Association is not a flood control district, but it has the duty once it receives flood water in its canal to exercise due care."
The Association contends that the Project is not a flood control device and the Association has no flood control duties. This court has stated:
"The necessity for the continued existence of the irrigation system is not challenged by Ramada. That system remains today as it did many years ago `indispensable for the maintenance of life and prosperity.' (citation omitted) The passage of ninety years has seen the continued use and dependence upon the system to such an extent that it is considered a natural part of the surroundings; its presence and existence has been accommodated and adjusted to by the community. In the case of Ramada, the high banks of the canal stop the flow of surface water from north to south causing difficulty to Ramada in the infrequent occasions of heavy rains, but to the landowners south of the canal in the same area it is a blessing because the canal does act as a buffer for the flow of surface waters. The canal is not a flood control device and was never intended as such, but, to the southern landowners in the area it acts somewhat in that capacity. Needless to say, any change in the present height of the canal could cause serious problems to those landowners who have *199 established their homes and businesses based on the assumption that the condition of the canal as it has existed through the years will remain the same." Ramada Inns, Inc. v. Salt River Val. Wat. Users' Ass'n., 111 Ariz. 65, 68, 523 P.2d 496, 499 (1974).
Because we did not impose strict liability upon the Association in Ramada Inns, supra, does not mean that the Association does not have any liability for failure to exercise reasonable control over floodwaters that have entered the canal system.
In a number of decisions this court has held the Association liable for damage proximately caused by its negligent operation and maintenance of the canal system. Salt River Valley Water Users' Association v. Stewart, 44 Ariz. 119, 34 P.2d 400 (1934); Salt River Valley Water Users' Association v. Arthur, 51 Ariz. 101, 74 P.2d 582 (1937); Salt River Valley Water Users' Association v. Blake, 53 Ariz. 498, 90 P.2d 1004 (1939). Ramada Inns, supra, does not overrule any of these cases. Once the flood waters entered the canal system, the Association was under a duty to exercise reasonable care in disposing of that water. Because the canal is not a flood control device, it does not absolve the Association from negligence in disposing of the excess water in its canals on 5 September. We believe the instruction given by the trial court correctly stated the law and the duty of the Association.
WAS THE EVIDENCE SUFFICIENT TO SUPPORT A JURY FINDING OF NEGLIGENCE?
We have read the entire trial transcript which is in excess of 5,000 pages. We find that the case was properly submitted to the jury on the issue of negligence and that there was sufficient evidence to support a verdict imposing liability on the Association. It is not the function of this court to establish the criteria or determine the policy of the Association with respect to the maintenance and operation of the canal system. However, we will review those particular acts or failure to act by the Association from which the jury could conclude the Association was negligent and which were the proximate cause of the flooding of plaintiffs' homes.
In order to discuss those acts from which the jury could properly infer that appellant was negligent, it is necessary to point out that the Association has a relatively sophisticated telemetry supervisory control system which enables it to electronically monitor the water level in the canal. At various points throughout the system there are check gates and a few wasteways, which enable the Association to release excess water from the canal into the Salt River. There are five canal gates and three wasteway gates at Evergreen, which is a point on the canal approximately four miles east of Pima Road. When the control gates at Evergreen are closed, no more water, except runoff, enters the canal system. Under normal conditions water flows down the canal from east to west at a rate of approximately one mile per hour. The Indian Bend Wasteway is about a mile and a half west of Pima Road. Also, there is a crosscut canal at 64th Street which runs south from the Arizona Canal.
A.R.S. §§ 45-204 and 45-205 articulate the duty of the Association to maintain and repair the canal. § 45-204 provides:
"Prohibition on canal owner to contract to carry water in excess of capacity of canal
"A person owning or controlling a canal, flume or other means for carrying water from a stream or water supply to lands for irrigation of the lands, shall not contract to carry more water than the canal, flume or other means is estimated to carry at any one time, whether the contract is made for measured time or acreage quantity. Such person shall keep the canal, flume or other means in good repair and condition so that it will carry the full amount of water contracted to be carried or delivered."
Plaintiffs introduced evidence at the trial which tended to show that runoff water *200 was entering the canal in the early afternoon of 5 September. Mr. Ewald, one of the plaintiffs, testified as follows:
"Q * * * Were you in the area of the Pima Bridge at an earlier time that same day?
"A Yes, I was.
"Q What time were you there?
"A Approximately noon, between noon and 1:00 o'clock.
"Q All right. Where were you, sir?
"A On the bridge.
"Q And did you see water running into the canal?
"A Yes. Water was running across the canal from the east to the west at that particular point.
"Q You mean north of the bridge?
"A North of the bridge.
"Q In that swale that we have just north of the bridge?
"A Right.
"Q How much water was running across?
"A I would say the deepest part was approximately four to six inches deep. I didn't walk through it, drive through it or anything.
"Q What expanse of highway?
"A Probably 50 feet wide.
"Q Where was the water going?
"A Was going to the west side of the road down that small ditch and directly into the canal.
"Q And you are sure this was before 1:00 o'clock on that day?
"A Yes."
Deforest R. Lestikow, Supervisor of Irrigation, Transmission and Communications for the Salt River Project, testified that by 2:30 that afternoon he had received notice that water was entering the Arizona Canal:
"Q Didn't you know at least by the early afternoon that there were substantial quantities of water pouring into the Arizona Canal between Evergreen and Pima Road?
"A The only information I had was what come in from the field and from this 
"Q My question is, sir, didn't you know that there were substantial amounts of water coming into your canal as early as 2:30 that afternoon? In that area?
"A Did I know? Here again, I don't know what you mean by substantial amounts. I knew that some water was coming into the canal, yes."
It had been raining off and on since the early morning hours of 5 September, and the weather remained quite threatening during the day. A severe storm was in progress. In our opinion, all of these factors, coupled with past experience, should have indicated to the Association by the early afternoon, at least, that substantial runoff water from the McDowell Mountains would enter the Arizona Canal in the area of Pima Road.
The Association admits that the five canal check gates at Evergreen were not completely closed until 6:31 p.m. Since Evergreen is 4 miles from Pima Road, even if the "ordered water" was flowing down the canal at a rate of 2 miles per hour, it would not be past the two breaches until after 8:30. Since the evidence indicates the breaches occurred about 8:00, the jury could have found that the ordered water combined with the runoff from the McDowells to over-tax the carrying capacity of the canal and cause the breaches. From the evidence offered at trial, the jury could also have concluded that the Association's failure to "dump the canal" by say 2:30 in the afternoon instead of 6:30 that night, by closing the 5 control gates and opening the 3 wasteway gates at Evergreen, constituted negligence which was the proximate cause of the flooding of plaintiffs' property.
Also, there are no spillways between Evergreen and Pima Road. Testimony given at trial indicates that failure to have at *201 least a few spillways in this natural drainageway might constitute negligence. Mr. Erickson, an expert witness for the Association, testified:
"Q But my question was, to enlighten us a little bit about earthen dams, whether you consider this to be a dam or not, I'm not asking you to agree, but isn't it true whenever you build an earthen dam you put a spillway in to avoid the sudden break or the washout type of situation which endangers the people below the dam?
"A If you're speaking of a dam 
"Q Yes.
"A  that impounds water?
"Q Yes.
"A And that's the purpose of a dam, to impound water, you always build a spillway that would protect the structure.
"Q And the people below, sir?
"A People and property below, yes, sir."
Mr. Weesner testified that a spillway would probably cost somewhere between seven and ten thousand dollars. Thus, it seems clear that the cost of building some spillways in this area, which might prevent future breaches in the canal, is not prohibitive.
The Association argues that our decision in Clausen v. Salt River Valley Water Users' Association, 59 Ariz. 71, 123 P.2d 172 (1942) prevents the Association from making any alterations in the canal or constructing any spillways. We disagree. In Clausen, supra, we did not hold that appellant may not build spillways, but rather that it cannot build a spillway which allows water to run on to another's land "without protecting these premises from its ravages." 59 Ariz. at 82-83, 123 P.2d at 177. Clausen merely requires that the Association build its spillways and wasteways in such a manner that they do not injure the property of others. Under Article 2, § 17 of the Arizona Constitution and A.R.S. § 12-1201, the Association has the power or authority to obtain right-of-ways for needed spillways.
The final major area in which the jury could have found the Association negligent cerns the demossing bridge. As stated earlier, the demossing bridge is a structure used for the periodic cleaning of the canal. The demossing bridge is about 100 to 200 yards east of the Pima Road Bridge. The larger of the two breaches occurred between the two bridges but just a few feet west of the demossing structure. The demossing bridge is about 2 feet above the operating high water of the canal. However, it spans the canal in such a manner that the bottom of the bridge is over 3.5 feet below the level of the bank of the canal. When the canal fills to the top of the south bank, the bridge is completely submerged and constricts the flow of water down the canal.
Donald Womack, an employee of the Association, testified:
"Q Now, the elevation of the top of this structure then as it spans the canal is 1285.95?
"A Yes.
"Q What would the bottom of that structure be?
"A Bottom of that is 1282.3.
"Q Now, is that solid concrete between 1285.95 and 1282.37?
"A Those are `T beams.'
"Q When I am talking about the bottom, I mean the bottom that would intercept the water. As it raises in the canal it is going to raise up and eventually hit the bottom of the bridge, is it not? What height would that be at?
"A That would be at elevation 1282.3, which is two feet above the high water, the operating high water.
"Q So that is solid concrete coming across there then at 1282.3 and it would constrict the flow of water at that elevation?

*202 "A It would constrict at that elevation, yes, sir.
"Q And that is only how far above high water, what you call the high water mark?
"A Two feet.
"Q And that is how many feet below the level of the south bank at that location?
"A Now, the bottom of the bridge is how much below the bank elevation?
"Q Yes.
"A That's 3.65 feet."
And:
"Q Now, let's assume that the canal is filled brimful on this occasion. As it comes to this structure, which is depicted here on Exhibit 3, how is it going to get past the structure?
"A You are assuming that we have water up to the elevation of the canal bank?
"Q Yes, sir.
"A East of the bridge?
"Q Yes, sir.
"A It would have to build up sufficient head to increase the velocity under the bridge and to get that same flow underneath.
"Q And that would speed up the water underneath the structure?
"A It would speed up slightly, right.
"Q Because more....
"A Increase the velocity.
"Q And cause more turbulance as the water comes out from under, true?
"A How much more turbulance I don't know. It's questionable. It would have a slightly higher velocity to get the same amount of water through a slightly reduced area.
"Q Aren't we talking about a span of water that is roughly 80 foot wide and four foot in depth when the canal is brimful at this point?
"A Yes.
"Q And as high as this bridge?
"A Yes, right."
Thus, on 5 September the demossing bridge acted as a barrier which increased the velocity of the water, the pressure, and increased turbulence on the earthen banks of the canal at the point of the first break.
We hold that there was no error in the denial of the Association's motion for directed verdict and find there was sufficient evidence to support a jury finding of negligence.
WAS THERE SUFFICIENT EVIDENCE OF RECKLESSNESS TO SUBMIT THE ISSUE OF PUNITIVE DAMAGES TO THE JURY?
The jury awarded plaintiffs punitive damages in the sum of $434,000. Punitive damages are based upon gross, wanton, malicious, and oppressive conduct, Hiett v. Howard, 17 Ariz. App. 1, 494 P.2d 1347 (1972), or conduct which shows spite, ill will, or reckless indifference to the interest of others, Sellinger v. Freeway Mobile Home Sales, Inc., 110 Ariz. 573, 521 P.2d 1119, 62 A.L.R.3d 161 (1974). Concerning punitive damages we have stated:
"A person is wantonly negligent if he wilfully does an act or fails to do an act which it is his duty to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the plaintiff but also involves a high degree of probability that substantial harm will result. (citation omitted) Wantonness implies a reckless indifference to the results of an act. (citation omitted)." Nichols v. Baker, 101 Ariz. 151, 153, 416 P.2d 584, 586 (1966).
Throughout the trial the defendant steadfastly argued that it is an irrigation system and not a flood control device, and Mr. Weesner, Chief Engineer for the Association, testified that "not one dime" would be allocated towards flood control. Mr. Lestikow, Supervisor of Transmission *203 and Communications for the Association, testified:
"A I think first and foremost our obligation is to deliver irrigation water, and I think the safety of the canal is second in our mind. Beyond that I think that everything is taken into consideration to do anything we can to alleviate any kind of damage to anything or anybody.
"Q But those other two considerations come first?
"MR. LEWIS: Again, I'm going to object to the form of the question as calling for a legal conclusion.
"THE COURT: He may answer.
"THE WITNESS: Yes, sir.
"Q And you have conducted yourself at all times in accordance with those priorities of obligation in your work with the Project?
"MR. LEWIS: Same objection.
"THE COURT: Same ruling.
"A Yes, sir."
While this testimony might indicate a somewhat callous attitude on the part of the Association, we do not believe the above quoted testimony constitutes a reckless or grossly negligent attitude which would warrant imposition of punitive damages. There was substantial evidence of negligence as discussed in this opinion on the part of the defendant. However, we do not believe there was a requisite showing of wanton or reckless disregard for plaintiffs' property by the Association to justify submitting the issue of punitive damages to the jury. Iaegar v. Metcalf, 11 Ariz. 283, 94 P. 1094 (1908); Gila Water Co. v. Gila Land and Cattle Co., 30 Ariz. 569, 249 P. 751 (1926); Lufty v. Roper, 57 Ariz. 495, 115 P.2d 161 (1941); Acheson v. Shafter, 107 Ariz. 576, 490 P.2d 832 (1971). We hold that it was error to submit the issue of punitive damages to the jury.
IS THE CANAL A NATURAL WATERCOURSE?
Appellant argues it was reversible error not to give its requested instruction No. 30 which provided:
"You are instructed that the Arizona Canal is of a permanent character; that it was created under circumstances indicating an intention that it should be permanent; that it has been used continuously with the intention that it shall be permanent since approximately 1883; that the Arizona Canal has all of the characteristics and incidents of a natural watercourse; therefore, the Arizona Canal, for the purpose of this lawsuit, is and has been since its construction in the same legal status as a natural watercourse, that is, a natural creek, river or stream, and the plaintiffs' property is subject to all of the burdens incident to location near a natural watercourse, including any flooding which may be caused or contributed to by the Arizona Canal, and the plaintiffs are without a legal remedy against SALT RIVER VALLEY WATER USERS' ASSOCIATION * * * for any damages resulting to their property which may have been caused or contributed to by the Arizona Canal."
And:
"When the plaintiffs purchased their properties in the vicinity of the Arizona Canal, they took their properties subject to the natural burden of the Arizona Canal. The Arizona Canal now constitutes the natural drainage in the vicinity of the plaintiffs' properties because of the long existence of the Arizona Canal. Therefore, you are instructed that the SALT RIVER VALLEY WATER USERS' ASSOCIATION cannot, at this time, alter the natural existence of the Arizona Canal by either raising the north bank or lowering the south bank in order to protect the plaintiffs since this would cause a change in natural conditions of the land which would result in a detriment to the property of others lying north and south of the Arizona Canal."
*204 We have stated that for some purposes the canal may be treated in law as a natural watercourse:
"The Arizona Canal meets all the requirements to be considered at this time a natural watercourse flowing through the Salt River Valley. By this we mean that it has developed the characteristics of a natural watercourse, but this does not mean that the water belongs to the public as do all wholly natural waters. (A.R.S. § 45-101), nor do we imply that the Water Users are relieved from the duty to maintain and repair the canal (A.R.S. §§ 45-204 and 45-205)." Ramada Inns, supra, 111 Ariz. at 67, 523 P.2d at 498.
That the canals may be treated as a natural watercourse for some purposes does not mean that they will be treated that way for all purposes. Unlike a natural watercourse, the Association has the responsibility for the operation and maintenance of the canals. We believe the court instructed the jury correctly as follows:
"You are instructed that the Defendant Salt River Valley Water Users' Association had a continuous duty from the time that it assumed control of this canal system, that is the subject matter of this lawsuit in October, 1917, to care for, operate and maintain its canal system with reasonable care to avoid injury. A failure to exercise reasonable care would constitute negligence."
DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN ADMISSION OR REJECTION OF EVIDENCE OR IN THE INSTRUCTION?
Appellant contends that there was error in the admission of some evidence and the rejection of other evidence. We note that the trial in this matter took over 30 trial days and the reporter's transcript runs to over 5,000 pages of testimony. The matter was fought by able and aggressive counsel. It would come as a surprise if there were not some error in the record. Not all error, however, is reversible. Rule 61, Rules of Civil Procedure, 16 A.R.S., states:
"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."
Article 6, § 27 of the Arizona Constitution provides:
"§ 27. Charge to juries; reversal of causes for technical error

"Section 27. Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law. No cause shall be reversed for technical error in pleadings or proceedings when upon the whole case it shall appear that substantial justice has been done."
We have reviewed the record and read the instructions. Considering the instructions as a whole, we find no prejudicial error. Any errors in the admission or rejection of evidence, if not cured by the instructions, were not prejudicial and do not demand reversal of judgment. State v. Michael, 107 Ariz. 126, 483 P.2d 541 (1971); Musgrave v. Githens, 80 Ariz. 188, 294 P.2d 674 (1956).
DID THE TRIAL COURT ERR IN DISMISSING THE ASSOCIATIONS' CROSS-CLAIMS AGAINST HALLCRAFT AND COE & VAN LOO?
Rule 13(g), Arizona Rules of Civil Procedure, 16 A.R.S., provides:
"Cross-claim against co-party
"A pleading may state as a cross-claim any claim by one party against a co-party *205 arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. The cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimaint."
We have held that contribution or indemnity is not permitted among joint tortfeasors. Blakely Oil v. Crowder, 80 Ariz. 72, 292 P.2d 842 (1956); DePinto v. Landoe, 411 F.2d 297 (9th Cir.1969); Employers Mutual Liability Insurance Co. of Wisconsin v. Advance Transformer Co., 15 Ariz. App. 1, 485 P.2d 591 (1971).
"* * * the right of a defendant to bring in a third-party defendant is limited to persons only who are secondarily liable to the original defendant and who are not primarily liable to the plaintiff in the original cause of action. If the third-party defendant is primarily liable to the original plaintiff he then becomes at most a joint tort-feasor with the third-party plaintiff and under such circumstances, according to all the authorities in the absence of statute, the original defendant, third-party plaintiff, may not maintain an action against him for contribution. * * *" Blakely Oil v. Crowder, supra, 80 Ariz. at 75, 292 P.2d at 843.
Hallcraft Homes, Inc., is the builder who developed the subdivision in which the plaintiffs' homes were located, and Coe & Van Loo are consulting engineers who did development work on the subdivision. The Association, in essence, contends that because the homes were planned and built on a floodplain without proper precautionary measures to protect them from flooding, Hallcraft and Coe & Van Loo are responsible to the Association for any judgment that might be obtained by the plaintiffs against the Association. We disagree. Any liability that Hallcraft and Coe & Van Loo might incur for the negligent placing of a housing subdivision in a floodplain should be to the homeowners and not to the Association. Hallcraft, Coe & Van Loo, and the Association are, at most, joint tortfeasors and the trial court was correct in dismissing the Associations' cross-claim against Hallcraft and Coe & Van Loo.
To further support its contention that it was error to dismiss its cross-claims against Hallcraft and Coe & Van Loo, the Association relies on this court's decisions in Spur Industries, Inc. v. Del E. Webb Development Co., 108 Ariz. 178, 494 P.2d 700 (1972) and Spur Feeding Co. v. Superior Court of Maricopa County, 109 Ariz. 105, 505 P.2d 1377 (1973). We think that appellant's reliance on these cases is misplaced. Our holdings in Spur Industries, Inc. v. Del E. Webb Development Co., supra, and Spur Feeding Co. v. Superior Court of Maricopa County, supra, were to a large extent confined to the particular facts presented by those cases and they are not applicable to the facts in this case. We find no error.
The judgment for punitive damages is reversed. The matter is remanded to the trial court with instructions to enter judgment for the plaintiffs less the amount of punitive damages and consistent with this opinion.
STRUCKMEYER, V.C.J., and HAYS, HOLOHAN and GORDON, JJ., concurring.