518 P.2d 1230

Kenneth R. LENNON and Darlene Lennon, husband and wife; John Eagle and Nikki Eagle, husband and wife; Gary C. Marriott; Andrea Doggett, formerly known as Andrea Marriott, Appellants,

v.

FIRST NATIONAL BANK OF ARIZONA, a National Banking Association, Appellee.

No. I CA–CIV 2159.

Court of Appeals of Arizona, Division 1.

Feb. 5, 1974.

Blake, Colter, Flickinger & Daudet, P. C., by James H. Colter, Phoenix, for appellants.

Streich, Lang, Weeks, Cardon & French by Earl E. Weeks, Phoenix, for appellee.

## OPINION

HATHAWAY, Chief Judge.

Defendants have appealed from the trial court's dismissal of Count Two of defendant Darlene Lennon's counterclaim through which she seeks to maintain a class action.[1]

In early 1970 Mrs. Lennon set up a personal checking account with plaintiff First National Bank of Arizona (the bank). The bank issued Mrs. Lennon a "Guardian Check Cashing Service Courtsey Card" which she signed and used. The agreement as to the use of this card was as follows:

"If Bank in its discretion pays from its own funds any amounts respecting checks drawn by me on which appears the above number, I promise to pay all such amounts with interest at 10% per annum to bank on demand and all attorney fees in collecting same. Bank shall not be required to honor any stop payment order respecting any such check. Bank owns this card and I agree to return it to bank immediately upon its request."

Between October 1, 1970 and January 25, 1971, 598 checks were written on the account with insufficient funds in the account to honor them. These checks were honored by the bank under the terms of the aforementioned card.

The bank subtracted from Mrs. Lennon's account a service charge of $3.00 each for 515 of the checks. It waived the service charge as to the remainder. The total service charge was $1,545.00. On or about January 27, 1972, the bank closed Mrs. Lennon's account and destroyed the "Guardian Check Cashing Service Courtsey Card" which she had returned on request. At that time—between overdrafts and service charges—Mrs. Lennon owed the bank approximately $4,900.00.

At the bank's request, Mrs. Lennon and the remaining defendants then executed a promissory note in favor of the bank in satisfaction of the indebtedness. They also executed a security agreement in favor of the bank which gave the bank a security interest in certain personal property contingent upon payment of the note. Mrs. Lennon soon defaulted on the monthly payments prescribed by the note and the bank brought a replevin action seeking possession of the property covered by the security agreement. The defendants answered, and in addition, Mrs. Lennon counterclaimed setting forth two claims. Count One sought rescission of the note, alleging that the service charges on her account had been unlawful, that the bank had erred

---

1. Since the remaining defendants did not join in Mrs. Lennon's counterclaim, their appeals are dismissed.

in computing the balance in her account, and that she had signed the note and security agreement as a result of fraud and duress.

In Count Two of the counterclaim, Mrs. Lennon asserted that she was a member of a class of people who had been assessed illegal service charges. She prayed that her rights and those of other class members be determined, that judgment be entered against the bank in a sum equal to the total amount of overcharges to class members, that the class be awarded punitive damages, and that she be allowed her costs and attorney's fees from the total award. Her theory that the service charges were unlawful is based upon former A.R.S. §§ 6–371 et seq. (repealed Laws 1973, Chap. 116 § 1, effective August 8, 1973). Those sections defined "check loans" and limited service charges thereon to 25 cents per check. The governing provision is now A.R.S. § 44–1205 which limits the interest and other charges assessable by a bank on check loans.[2] Whatever merit there may be to the contention that the bank's transactions with Mrs. Lennon were check loans and subject to the above limitations, we are concerned only with the trial court's dismissal of the class action aspect of this case (Count Two). No challenge has been made to Mrs. Lennon's right to pursue this claim individually as asserted in Court One of her counterclaim.

A plaintiff seeking to bring a class action has the burden of showing the appropriateness of a class action and the trial court has discretion in determining whether this burden is met. Carpinteiro v. Tucson Sch. Dist. No. 1 of Pima County, 18 Ariz.App. 283, 501 P.2d 459 (1972). First, the plaintiff must show the following prerequisites enumerated in A.R.C.P. Rule 23(a), 16 A.R.S.[3] "One or more members

of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

In addition Rule 23(a) requires by implication that a definable class exist, De Bremaecker v. Short, 433 F.2d 733 (5th Cir. 1970), and that the representative be a member of the class. Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). There is no question that a definable class exists here. However, throughout the record we find varying definitions of the class sought to be represented. The trial court, if possible, should employ its discretion to define the class in a manner that will allow utilization of the class action procedure. Dolgow v. Anderson, 43 F.R.D. 472, 492 (E.D.N.Y.1968), rev'd on other grounds, 438 F.2d 825 (2nd Cir. 1970). Since Mrs. Lennon cannot represent those not similarly situated, the class should be limited to persons who hold or have held Guardian Check Cashing Cards and who have been assessed the allegedly illegal service charges.

The bank argues that Mrs. Lennon cannot be a member of the class since she did not maintain a checking loan account with the bank at the time she filed her counterclaim. The fact that Mrs. Lennon's account was terminated prior to the filing of her counterclaim should not deprive her of class membership. In Seligson v. Plum Tree, Inc., 55 F.R.D. 259, 261 (E.D.Pa. 1972), the court held that "(t)o be a member of a class, a party must have rights in the cause of action asserted on behalf of

---

2. Defendant as a national bank is also subject to federal statutes and regulations. See 12 U.S.C.A. §§ 21 et seq. and 12 C.F.R. §§ 3.1 et seq. Under 12 U.S.C.A. § 85 a national bank is generally subject to state-imposed limitations upon interest and charges on loans. Under 12 C.F.R. § 7.7105 a national bank

has the power to issue "check guarantee cards" similar to that issued Mrs. Lennon.

3. A.R.C.P. Rule 23, governing class actions, is identical to Rule 23 of the Federal Rules of Civil Procedure. Therefore, federal cases construing F.R.Civ.P. Rule 23, while not controlling, are authoritative.

the class, i. e., he must have suffered or be threatened with the same injury alleged on behalf of the class." Clearly, Mrs. Lennon was assessed the allegedly illegal service charges along with the rest of the class. Her alleged harm is identical to absent class members.

The bank cites Carroll v. Associated Musicians of Greater New York, 316 F.2d 574 (2nd Cir. 1963); Syna v. Diners Club, Inc., 49 F.R.D. 119 (S.D.Fla.1970); and Sawyers v. Grand Lodge Int'l Ass'n of Machinists, 279 F.Supp. 747 (E.D.Mo. 1967), as authority for its assertion of lack of class membership. A careful reading of these cases reveals that in each, the purposed class representative lacked standing to sue individually.

■ We have also considered the possibility that in signing the note representing the amount owed to the bank, Mrs. Lennon has waived any claim of illegality· which she may have had as to the original debt. If the service charges underlying the note are found to be illegal, case law indicates that the claim of illegality could not have been waived by signing the note. Williamsen v. Jernberg, 99 Ill.App.2d 371, 240 N. E.2d 758 (1968); Shreveport Auto Finance Corp. v. Harrington, 113 S.2d 476 (La.App. 1959); Duncan v. Black, 324 S.W.2d 483 (Mo.App.1959); 10 C.J.S. Bills and Notes § 154. Therefore, it would appear that Mrs. Lennon has standing to assert the claim and is a member of the class.

Rule 23(a)(1) is satisfied since it is clear that the class is so numerous that joinder of all members is impracticable.

■ Rule 23(a)(2) requires simply that there exist questions of law or fact common to the class. Whether or not the loans made pursuant to the Guardian Check Cashing Card would be check loans under our statutes is certainly a common question. If the service charges are found to be illegal, the determination of what portion of each assessed service charge should be refunded would be a common question. Our consideration of whether common questions predominate over indi-vidual questions, as required by Rule 23(b)(3), will be discussed below. ·

■ Under Rule 23(a)(3) the claims of the representative party must be "typical" of the claims of the class. Some courts have held that the typicality requirement is satisfied when common questions of law or fact exist. Green v. Wolf Corp., 406 F.2d 291, 299 (2nd Cir. 1968). Others have held a representative's claim typical if the interests of the representative are not antagonistic to those of absent class members. Thomas v. Clarke, 54 F.R.D. 245 (D.C.Minn.1971); Katz v. Carte Blanche Corp., 52 F.R.D. 510 (W.D.Pa.1971). Still others require the representative to demonstrate that absent class members have suffered the same grievances of which he complains. White v. Gates Rubber Company, 53 F.R.D. 412, 415 (D.C.Colo.1971). Under each of the above tests, we find Mrs. Lennon's claim to be typical of the remainder of the asserted class. There are common questions, her position is clearly not antagonistic to those of the class, and her alleged agrievance is identical to that of the class.

■■ Rule 23(a)(4) requires that the plaintiff show that he "will fairly and adequately protect the interests of the class." In Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–563 (2nd Cir. 1968), this requirement was summarized as follows:

"(A)n essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the class."

We have found nothing indicating that lack of adequate representation could have been the basis of the trial court's dismissal of the class action. Mrs. Lennon should be an excellent representative since she presumably has more at stake (i. e., a larger claim) than most class members. No

doubts have been raised as to the qualifications of her attorneys.

■ Having found the requirements of Rule 23(a) met, we turn to 23(b) which lists, in addition to 23(a), three requirements, any one of which must be satisfied before bringing a class action. Mrs. Lennon seeks to proceed under Rule 23(b)(3) which provides as follows:

> "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> \* \* \* \* \* \*
>
> (3) The court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

In requiring that common questions predominate over individual questions and that a class action be superior to other forms of relief, Rule 23(b)(3) seems to focus on the central question of manageability. In fact, subsection (D) requires that the court consider manageability in making findings as to these two questions. When, as here, the criteria listed in subsections (A), (B), and (C) are not relevant,[4] the key question involved in the two Rule 23(b)(3) findings should be manageability.

Our Supreme Court has very recently considered the manageability of a class action in Reader v. Magna-Superior Copper Company, 110 Ariz. 115, 515 P.2d 860 (1973). In that case, plaintiffs sought to bring a class action aginst six owners or operators of copper smelters on behalf of a class of approximately 700,000 residents of Maricopa County "who have occasion to and in fact do breathe and visualize air polluted by defendants." (110 Ariz. at 115, 515 P.2d at 860).

In *Reader,* a divided court held that the case was unmanageable. Although the majority opinion found unmanageability in the context of Rule 23(a)(2), we feel that the case bears on our present Rule 23(b)(3) consideration of whether common questions of law or fact predominate over individual issues. The Supreme Court was clearly concerned with the numerous individual issues revolving around the claims for damages noting the "impossibility of the vast majority of the members of the class being able to put a value on their individual damages." (110 Ariz. at ——, 515 P.2d at 861). In contrast, the damages sought here would be liquidated as to each individual class member and ascertainable from records kept by either the bank or the individual.

The bank asserts that certain defenses it would have against class members would raise individual questions which would outnumber the common questions. It argues that the defenses of waiver, estoppel, affirmance and laches vary as to "the thousands of members of the supposed class." Without deciding the question we note the following general statement of the law quoted from 17 Am.Jur.2d § 232:

> "As a general rule, an illegal contract cannot be validated by a waiver of illegality . . . . It is likewise the general rule that as between the parties to a contract, validity cannot be given

---

4. There are no serious assertions here that members of the class would be interested in individually bringing separate actions, that there is any other litigation currently pending as to these service charges, or that it would be "undesirable" to concentrate the claims in the Superior Court of Maricopa County.

to it by estoppel if it is prohibited by law or is against public policy." (Footnotes omitted)

Thus there appears a strong likelihood that if the trial court finds the service charges to be illegal, there will be little if any individual litigation as to these defenses.

The bank next asserts that numerous individual questions in the form of compulsory counterclaims[5] will render the action unmanageable. It argues that it will be required to assert two categories of counterclaims.

The first would be for a "reasonable" service charge in the event the $3.00 charge is found to be illegal. The trial court could easily compute the maximum legal charge and deduct it from each $3.00 recovered by a class member. In doing so, it would be deciding a common question of law since the maximum legal charge would apply to every $3.00 charge.

The second set of compulsory counterclaims described by the bank would be those against class members who are currently overdrawn in their accounts. In Weit v. Continental Illinois Nat. Bank & T. Co. of Chicago, 60 F.R.D. 5 (N.D.Ill. 1973), plaintiffs sought to represent a class of credit card holders whom they alleged had been charged excessive interest rates which had been fixed in restraint of trade. The defendants asserted that the class was unmanageable (as the bank does here) because of compulsory counterclaims against class members with unpaid balances. The court held (60 F.R.D. at 8) as follows:

"We find nevertheless that the plaintiff classes are not rendered unmanageable by such counterclaims. In the case at bar, they would consist solely of liquidated amounts owed by class members on their delinquent accounts. These could best be ascertained from the defendants' own records. Few class members would be expected to contest either the fact of liability or the amount owed. This court

would not be transposed into a vast 'collection agency' as defendants suggest, because if a counterclaim exceeded a class member's damages, the pertinent defendant would merely be in possession of a judgment for the difference, which it would then be able to enforce by normal procedures."

Thus we conclude that common questions of law or fact do predominate over individual questions. The trial of this case as a class action will not splinter into numerous trials of individual issues and the trial court could not have based its dismissal on a failure to satisfy this requirement.

The second requirement of Rule 23(b)(3) and relating to manageability is that the class action procedure be superior to other available methods of relief. The only possible alternative which we envision would be individual suits. It is highly unlikely that any significant number of absent class members would individually file lawsuits against the bank in light of the relatively small individual recoveries. Many class members undoubtedly have only been assessed occasional service charges on their Guardian Card checks. Mrs. Lennon, who was assessed 515 charges of $3.00 each would seem to be the exception and not the rule. Therefore, the only possible device which would afford relief to numerous plaintiffs with small claims would be a Rule 23 class action. In 7A Wright and Miller, Federal Practice and Procedure § 1779, the authors state:

"Individual actions also may be an inferior alternative to the class action when the economics of the situation or other practical considerations make it impossible for the aggrieved members to vindicate their rights by separate actions. Thus a group composed of consumers or small investors typically will be unable to pursue their claims on an individual basis because the cost of doing so exceeds any recovery they might secure. When this is the case it seems appropriate to conclude that the class action 'is superior

5. See A.R.C.P. Rule 13(a).

to other available methods for the fair and efficient adjudication of the controversy'. Of course, it must be recognized that the effect of making Rule 23(b)(3) available is to enable recourse to the courts in situations in which it otherwise would be unavailable. This is not troublesome when the action is predicated on a statutory mandate that is designed to promote the private rectification of conduct thought undesirable or to effectuate some other expression of public policy."

We find that the trial court erred in holding that the requirements of Rule 23 have not been met. This case is ideal for class action treatment. To hold otherwise would totally emasculate Rule 23 and render it impossible to bring a class action in this jurisdiction. In *Reader,* supra, our Supreme Court noted "a need for viable class action relief within our judicial system" (110 Ariz. at 117, 515 P.2d at 862).

We therefore reverse the dismissal of Count Two of appellant's counterclaim and order that it proceed as a class action pursuant to Rule 23.

KRUCKER and HOWARD, JJ., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120(E).