118 Ariz. 329 (1978)
576 P.2d 517
M.M. MARKIEWICZ, H.S. Logwood, Ronald C. Kelner, Gordon S. Jaeck, Mack C. Brooks, Marie L. Millstone, John L. Neighbors, Gene Sewell, Arthur Witt, Ruel A. Sports, John W. Slingloff, Julius M. Simone, David Kauffman, Robert Balzano, Donna T. Balzano, John Zollner, Robert Hicks, J.M. Anderson, Ivan R. Gale, Frank Olson, Gerald G. Posthumus, Betty J. Kusse, Norman Weightman, Nicholas Demeter, Arthur Sukis, George Baroch, Robert Decot, Wm. J. O'Neill, Jr., Leland J. Hanchett, Roy F. Aycock, Hugo Pulice, H.E. Stedwell, Arthur J. Rheinlander, Jr., J. Patrick Linton, Mrs. A.B. Carpenter, now known as Mrs. Helen (Carpenter) Schoff, Joe Domanico, Frank E. Castle, Jr., Mary C. O'Neill, Charles A. Hornback, Herbert L. Kennel, Robert C. Stevens, Roderic D. Simpson, Bettie MacArthur, Pamela F. Wyatt, Terence Shelbourne, Dottie Dow, Veronica S. Funk, Gerald Dean Coffin, Edward C. Diorio, Harvey B. Dubois, R.W. Benson, Edward Brown, W.H. Beattie, Harold G. Bailey, S.W. Blakeley, W.B. Cooke, Steve Fuse, E.J. Gilsdorf, Clarence Johnson, John Mozingo, G.L. Pennington, George Stalnaker, James Thiem, Robert Thiem, John T. Tripp, John Vasquez, and Robert Whisenant, Appellants,
v.
SALT RIVER VALLEY WATER USERS' ASSOCIATION, an Arizona Corporation, and Salt River Project Agricultural Improvement and Power District, a political subdivision of the State of Arizona, Appellees.
No. 1 CA-CIV 3141.
Court of Appeals of Arizona, Division 1, Department A.
January 24, 1978.
Rehearing Denied February 22, 1978.
Review Denied March 14, 1978.
*332 Burch, Cracchiolo, Levie, Guyer & Weyl by Michael E. Bradford and Welliever, Smith & Howard by Robert J. Welliever, Phoenix, for appellants.
Jennings, Strouss & Salmon by Nicholas Udall and M. Byron Lewis, Phoenix, for appellees.
OPINION
HAIRE, Presiding Judge.
Appellants, a group of homeowners, sued the appellees Salt River Valley Water Users' Association (the Association) and Salt River Project Agricultural Improvement and Power District (the District) when appellants' homes were damaged by water escaping from the Arizona Canal. The Arizona Canal is operated by the Association, as agent for the District.
The facts giving rise to this action are as follows. The Arizona Canal crosses the Salt River Valley in a generally east-to-west direction. It runs from Granite Reef Dam on the Salt River east of metropolitan Phoenix, to Skunk Creek on the west. A cross-section of the canal would show that it is an open, earthen-banked trench, with the south bank elevated substantially higher than the north bank.
As it traverses the Valley, the canal intersects at least four major, natural washes. When it rains, surface runoff collects in these washes and flows in a north-to-south direction. If the quantity of water flowing down these washes is not too great, it simply flows into the Arizona Canal and is intercepted by the high south bank of the canal. However, during extremely severe storms, the wash water will overflow even the south bank of the canal, and will continue in its natural north-to-south drainage pattern.
When a storm is anticipated, the Water Users' Association follows storm control procedures designed to enable the canal system to accept and safely carry off as much runoff as possible. To do this, the canal is "dumped"; that is, no more stored water is permitted to enter the canal at Granite Reef Dam and all available diversion facilities are opened to remove water from the canal. Still, the run-off can be so heavy that it exceeds the canal's capacity, and overtops the south bank. When water overflows an earth bank, there is a tendency for the bank to erode and eventually wash out. To protect its canal, the Association has installed spillways  concrete-covered notches  in the south bank which permit water to spill out of the canal before the banks are overflowed.
Appellants are homeowners who, on June 22, 1972, resided in Phoenix south of the Arizona Canal in an area bounded by (approximately) 40th Street on the East, 35th Street on the West, Camelback Road on the North, and Campbell Road on the South. The Arizona Canal intersects 40th Street just north of Camelback Road, and travels in a northwesterly direction above the appellants' *333 homes. West of 40th Street, at what would be 38th or 39th Street, the canal crosses the two forks of Cudia City Wash, one of the major washes in the Salt River Valley. To the east, at 48th Street, the Old Crosscut Canal connects with the Arizona Canal and provides a means to divert water south to the Salt River. The Salt River Valley is subject to brief, high intensity summer storms. Several of these storms have been severe enough to cause major breaches in the Arizona Canal. The records of the Association show that in 1939 a desert storm produced runoff that broke the canal banks in several places. One break occurred 175 feet west of 40th Street. In 1943, another storm produced numerous breaches in the canal, and the Association recognized that the Old Crosscut Canal's gates were "inadequate" for diverting water from the Arizona Canal. This inadequacy contributed to breaks downstream (west) from 40th Street. Four witnesses testified to seeking a break in the Arizona Canal near 40th Street during a severe storm in 1970. However, the Association denied that any break occurred there.
On June 22, 1972, a severe rainstorm occurred in the Cudia City drainage area. It rained hard for about two hours, beginning at about 6:00 a.m. At about 8:00 a.m. the rain relented somewhat. The storm has been characterized as one of 500-year return frequency, i.e., a storm so severe that it can be expected to occur, on the average, only once in 500 years.
During this storm, the Association went into its storm control procedures. By 7:00 a.m. no more irrigation water was being released into the Arizona Canal. However, large quantities of water had begun flowing down the Cudia City Wash and other arroyos. Exactly when this water hit the canal is unclear, but Cudia City Wash water entered the canal in sufficient quantity to create a backflow, causing water in the canal to flow east, or upstream. When the full flow of Cudia City Wash hit the canal, the canal filled "in minutes". Flood Control Spillway No. 2 west of 40th Street ran full, and water began overtopping the south bank of the canal between 32nd Street and 40th Street. The water pouring over the canal caused the south bank to erode and give way in three places west of 40th Street. This was the same location where the canal had broken in 1939, and, according to appellants' witnesses, in 1970. The three breaches widened and deepened as water flowed through them. By 10:30 a.m. the breaks were each three to five feet deep and about 25 feet wide. Eventually, an island between two of the breaks washed away, so that the three breaks became two.
Between 8:00 and 9:00 a.m. several of the appellant homeowners observed a wall of water rushing through the area south of the canal. This water was flowing swiftly and carried great amounts of mud and debris. Possessing sufficient kinetic force to tear down fences and carry away automobiles, the flood waters caused serious damage to appellants' homes and other property.
Appellants originally sought to bring this suit as a class action. However, the trial court determined that the action could not properly be maintained as a class action. Appellants filed a notice of appeal from this ruling, but the appeal was later dismissed pursuant to stipulation of the parties, and appellants proceeded in their individual capacities. On appellants' motion, the case was ordered bifurcated into separate trials on the issues of liability and damages. After a fourth and final amendment to their complaint, appellants asserted claims against appellees based on two theories: strict liability for diversion of a natural watercourse, and negligence. Before trial, the court struck appellants' strict liability claim. The case then went to jury trial on the issue of negligence liability. At the close of plaintiffs' case, a directed verdict was granted in favor of the defendant District. At the close of all the evidence, and without submitting the case to the jury, a directed verdict of no liability was granted in favor of the Association.
On appeal, plaintiffs assert that the trial court committed error in the following respects:
*334 A. Striking the strict liability claim;
B. Directing a verdict for the District on the basis that the District was not liable for the acts of the Association;
C. Failing to admit Exhibit 76 into evidence;
D. Directing a verdict in favor of the Association on the issue of negligence; and
E. Denying appellants the right to proceed as representatives of a class.
At oral argument, appellees conceded point B above, admitting that the District may be derivatively liable for the acts of the Association in the maintenance and operation of the Arizona Canal.
The appellee Water Users' Association by cross-question, raises a jurisdictional issue which, if resolved favorably to the Association, would compel an affirmance of the judgment of the trial court.
I. DID THE TRIAL COURT HAVE JURISDICTION OVER THE NECESSARY PARTIES AND SUBJECT MATTER?
The association presents two arguments that the court was without jurisdiction to render a judgment in this case. The first argument concerns immunity of the Association; the second argument asserts the absence of an indispensable party, specifically, the United States.
Appellee Water Users' Association argues that it operates the canal as an agent of the United States and that agents of the United States are immune from suit. The recent case of Salt River Valley Water Users' Association v. Giglio, 113 Ariz. 190, 549 P.2d 162 (1976) destroys this argument. Giglio held that the Association is not, at least for purposes of this type of lawsuit, an agent of the United States. 113 Ariz. at 196-97, 549 P.2d at 168-69. Moreover, even if it were an agent, it would not be immune from civil suit for flood damage. Id. at 197, 549 P.2d at 169. Giglio went on to hold that the United States is not an indispensable party to such a lawsuit. Id. at 197-98, 549 P.2d at 169-70, as any judgment would be paid by the Association, not by the United States.
II. DID THE TRIAL COURT ERR IN STRIKING APPELLANTS' CLAIM OF STRICT LIABILITY AGAINST THE ASSOCIATION FOR DIVERSION OF A NATURAL WATERCOURSE?
Appellants insist that the Association diverted the flow of a natural watercourse (Cudia City Wash),[1] and should be held strictly liable for the resulting damage. The case of Ramada Inns, Inc. v. Salt River Valley Water Users' Association, 111 Ariz. 65, 523 P.2d 496 (1974) appears to preclude the imposition of strict liability for flood damage that can be traced to the Arizona Canal. Appellants argue that the issue of strict liability for diversion of a natural watercourse is a wholly different theory than that presented to the court in Ramada Inns, supra. Concededly, the plaintiff in Ramada Inns sought to justify strict liability primarily on other grounds. The reasons for strict liability most ardently stressed were: (1) the Arizona Canal is a dangerous instrumentality; and (2) public policy favors placing flood losses on the Association, since it can better distribute the losses. The Supreme Court expressly rejected both of these arguments. In our opinion it also rejected the diversion theory.
In Ramada Inns, plaintiff's motel was flooded when drainage water, obstructed by the Arizona Canal, collected north of the canal. Clearly, such facts involve the theory of diversion of naturally-occurring water.[2] Ramada's complaint alleged liability *335 for damming the flow of these waters, and the Supreme Court's holding encompassed the diversion theory. The court stated the issue thus:
"Should the Water Users be held strictly liable for damage caused by the flooding or diversion of water by the Arizona Canal?" 111 Ariz. at 66, 523 P.2d at 497
The court refused to impose strict liability.
In Ramada Inns, it was held that the Arizona Canal possesses many of the attributes of a natural watercourse.[3] People have accommodated themselves to its existence just as they would accommodate to a wholly natural topographical feature.
The cases cited by appellants for the proposition that there is strict liability for the diversion of a natural watercourse are not applicable to the circumstances presented here. Schlecht v. Schiel, 76 Ariz. 214, 262 P.2d 252 (1953); Maricopa County Municipal Water Conservation District No. 1 v. Warford, 69 Ariz. 1, 206 P.2d 1168 (1949); Clausen v. Salt River Valley Water Users' Association, 59 Ariz. 71, 123 P.2d 172 (1942); Maricopa County Municipal Water Conservation District No. One v. Roosevelt Irrigation District, 39 Ariz. 357, 6 P.2d 898 (1932). In none of those cases was the "diversion" so long-standing and permanent that it could be regarded as a natural feature of the land. Rather, the cases involved a recent change in the natural flow of water, which inundated lands that would otherwise have been undamaged. Ramada Inns recognized that liability will result when natural watercourses are altered to the detriment of landowners who have relied on the continued existence of the status quo.
"Needless to say, any change in the present height of the [Arizona Canal] could cause serious problems to those landowners who have established their homes and businesses based on the assumption that the condition of the canal as it has existed through the years will remain the same." 111 Ariz. at 68, 523 P.2d at 499
In the present case, no significant changes had been made in the Arizona Canal for many years.
This court has previously interpreted Ramada Inns to mean that only negligence claims may now be asserted for flooding caused by the Arizona Canal. Salt River Project Agricultural Improvement and Power District v. City of Scottsdale, 24 Ariz. App. 254, 256, 537 P.2d 982, 984 (1975). We see no reason to depart from that view now.
III. DID THE TRIAL COURT ERR IN DIRECTING A VERDICT IN FAVOR OF THE ASSOCIATION ON THE ISSUE OF NEGLIGENCE?
The Association contends that it owes the plaintiffs no duty to prevent or minimize flood damage from waters escaping the Arizona Canal. The Association argues that Ramada Inns, supra, established that the Arizona Canal is not a flood control facility, and that the Association's duty of care in the operation of the canal is limited to that imposed by A.R.S. §§ 45-204 and 45-205 (relating to the duty of maintenance of irrigation canals). The second prong of this argument is no longer tenable in the wake of Giglio, supra. In Giglio, certain homes in Scottsdale were flooded when storm waters ruptured the south bank of the Arizona Canal. Our Supreme Court held:
"Because we did not impose strict liability upon the Association in Ramada Inns, supra, does not mean that the Association does not have any liability for failure to exercise reasonable control over floodwaters that have entered the canal system.
* * * * * *
"Once the flood waters entered the canal system, the Association was under a duty *336 to exercise reasonable care in disposing of that water. Because the canal is not a flood control device, it does not absolve the Association from negligence in disposing of the excess water in its canals...." 113 Ariz. at 199, 549 P.2d at 171
In Giglio, the court held that there was sufficient evidence to support the jury's finding that the Association was negligent in the operation of the canal. Three examples were given by the court whereby the jury could have found the Association negligent: (1) the Association took too long to "dump" the canal  that is, empty it of ordered irrigation water; (2) the Association failed to provide spillways between Evergreen and Pima Road to relieve the pressure on the canal at flood times; and (3) the Association's "demossing bridge" restricted the flow of water, added to its velocity and turbulence, and contributed to the breaks in the canal.
Giglio and Ramada Inns define the parameters of the Association's duty of care in the operation of the Arizona Canal. Certain general principles can be drawn from these cases. First, there is an obligation to maintain the canal in good operating condition. Not only should the canal be maintained to handle normal irrigation water without mishap, e.g., Salt River Valley Water Users' Association v. Arthur, 51 Ariz. 101, 74 P.2d 582 (1937), but the Association must exercise due care in keeping the canal ready to absorb the storm waters that periodically flow into it. Performance of this duty may include keeping the canal free of structures or conditions that would restrict the flow.[4]See Giglio, 113 Ariz. at 201-02, 549 P.2d at 173-74 (negligence to have a bridge unnecessarily constrict the canal).
Second, the Association must prudently manipulate the canal and its appurtenances so that it may intercept the greatest amount of drainage without bursting or overflowing. This would involve emptying or dumping the canal of irrigation water in anticipation of heavy storm runoff, and opening the available diversion facilities.
Third, to fulfill its duty of care to prevent the canal from breaking, the Association may have to install spillways (or other diversion facilities) in areas where storm water naturally drains into the canal. Whether the failure to have such spillways is a breach of duty will depend on many factors: for instance, the amount of runoff that can be expected; the capacity of existing diversion facilities; the cost of new spillways; and the feasibility of acquiring rights-of-way for new spillways. In Giglio, there were no spillways in the critical section of the canal, and the cost of installing them was relatively modest.
It is not completely clear whether Giglio requires the Association to make capital improvements to increase the canal capacity so as to reduce the possibility that storm waters might overflow the canal's banks. We think not. In Giglio, the damage was done by breaches in the canal. We feel that to impose on the Association an obligation of increasing the carrying capacity of the canal by capital improvements is inconsistent with the canal's recognized status as a natural watercourse. As Giglio observed, the community has accommodated to the presence of the Arizona Canal. The canal is considered a permanent feature of the land, and property owners may rely on the canal retaining its present configuration. Landowners should realize that, from time to time, rain will come which exceeds the canal's capacity to contain it. The Association owes these landowners a duty to use reasonable care to operate the Arizona Canal up to its design capacity, to minimize the destructive effect of desert storms. But there is no duty to expand the storm or flood control capacity beyond that which already exists.[5] To hold *337 otherwise would ignore the statement in Giglio that "the canal is not a flood control device".
While the possibility of storm waters overflowing the canal's south bank is a readily perceived natural hazard, the danger of breaks in the canal is not so apparent. Although landowners must bear the risk of storms which exceed the capacity of the existing canal, they should be able to rely on the canal maintaining its structural integrity. Giglio indicates that the Association must exercise reasonable care to prevent breaks in the canal. In some cases, reasonable care means making capital improvements to reduce the possibility of breaches.
On reviewing the trial court's directed verdict for defendants, we must view the facts and all reasonable inferences therefrom in the light most favorable to the plaintiffs. E.g., Eaton Fruit Co. v. California Spray-Chemical Corp., 103 Ariz. 461, 445 P.2d 437 (1968); Bisnett v. Mowder, 114 Ariz. 213, 560 P.2d 68 (App. 1977). To determine whether appellants have introduced evidence from which a jury could find the Association negligent, we must measure appellants' proof against the standards set forth in Giglio, supra.
Initially, we note that appellants make no claim that the Association failed to properly dump the canal, as plaintiffs alleged in Giglio. Rather, appellants contend that the Association was negligent in maintaining inadequate diversion facilities, and in failing to strengthen the south bank of the canal. To support their contentions, appellants assert several acts of alleged negligence. We shall discuss these separately.
There are only two diversion facilities which might effectively reduce the quantity of water in the canal at 40th Street, the place where the canal overflowed and broke: The Old Crosscut Canal at 48th Street, and Spillway No. 2, at what would be 39th Street.
Appellants claim that the gates of the Old Crosscut Canal were inadequate to divert water from the Arizona Canal in times of heavy runoff. There is testimony that diverting water into the Old Crosscut was a key to minimizing the amount of water that flowed past 40th Street and the Cudia City Wash area. To the extent that the Arizona Canal could be relieved of excess water, the pressure on the south bank would be correspondingly reduced. The Association had in its files a report on the flood of August 4, 1943, which indicated that the gates of the Old Crosscut were inadequate to furnish sufficient relief to the canal, and that in 1943 this inadequacy contributed to breaks downstream (Exhibit 75). It was also apparent, according to testimony of the Association's experts that urbanization since 1943 increased the amount of runoff that occurs in heavy rain. Yet the Old Crosscut remained in essentially the same condition until after the 1972 flood. In our opinion a jury could find that the Association's failure to improve the gates was negligence and that this negligence contributed to the breaks and overtopping of the canal at 40th Street in 1972.
The Association contends that federal law (43 U.S.C.A. § 421a) prohibits it from altering the canal's capacity to dispose of natural runoff. But 43 U.S.C.A. § 421a does not prohibit changes in existing projects. The statute merely states that when an existing waterway is enlarged or altered to dispose of natural runoff, it will not qualify for the special loan funds that are allocated for new drainage systems. 43 U.S.C.A. § 421b; see [1972] U.S.Code Cong. & Admin.News, pp. 3597-3602.
The other safety valve for the Arizona Canal was Spillway No. 2. Appellants introduced evidence that the spillway, if larger, might have prevented a breach or overflow of the canal. However, appellants failed to show that the Association was *338 negligent in not expanding Spillway No. 2. Unlike the Old Crosscut Canal, the Association did not have prior experience with any inadequacy of the spillway. Appellants failed to present evidence that a spillway of that size and location was in any way unreasonable.
A third possible instance of negligence was the Association's failure to gunite the south bank of the canal in the vicinity of 40th Street. Guniting consists of applying a thin (approximately 1 1/2 inches) layer of concrete to the banks of the canal, reinforced with wire netting. There was testimony that gunite is an effective way of preventing the canal banks from washing out. Conflicting testimony stated that gunite would be ineffective unless it was carried over the top of the canal bank and down the other side. Such a thin layer of concrete would be insufficient to withstand the Salt River Project's vehicular traffic along the crest of the south bank of the canal; therefore, a much thicker paving would have to be applied on the top. Even so, the jury could find that guniting would be a feasible way to prevent erosion and breaks in the canal at certain critical locations.
The Arizona Canal had broken in the same location near 40th Street in 1939, and there was credible eyewitness testimony that breaks also occurred there in 1970, although this latter contention was denied by witnesses for the Association. Since the natural drainage patterns imposed a special stress on the canal at 40th Street, since it had broken there twice before, and since there was testimony that the canal had been gunited at another location to prevent washouts, the jury might have found that the Association's failure to gunite this portion of the south levee was negligence.
The Association contends that United States v. Ure, 225 F.2d 709 (9th Cir.1955) holds that failure to gunite cannot be considered negligence. We disagree. That case involved the Federal Tort Claims Act, which provides that no tort claim may be made against the United States for an act involving the discretionary, or planning, function of a federal employee. 28 U.S.C.A. § 2680(a). The court held that the decision not to gunite was the kind of discretionary judgment for which no liability could result.
From the above-described evidence, a reasonable juror might conclude that the Association was negligent, and that such negligence contributed to the canal overflowing and breaking. The Association argues, however, that appellants have failed to show that the alleged acts of negligence were the proximate cause of appellants' injuries. Its contentions are (1) that the storm was so severe and caused so much water to enter the canal, that the canal would have overflowed in any event, and (2) that appellant's damages were caused by water exiting the spillway and overtopping the canal, not by the escape of water through the breaches.
If appellants would have suffered exactly the same damages in the absence of the Association's negligent acts, the Association would not be liable, obviously. Restatement (Second) of Torts, § 432(1) and Illustration 2 (1965).[6] But if the Association's negligent acts were a cause of some part of appellants' damages, the Association would be liable for at least the damages it caused.
Appellants presented evidence which, viewed most favorably to appellants' case, would justify a finding that the Association's negligence caused at least a part of appellants' damages. There was evidence that the Association's maintenance of inadequate gates on the Old Crosscut Canal caused more water than necessary to be in the Arizona Canal at 40th Street. This would have caused more water to overflow *339 the canal, and more water to pour through the breaches. The breaches in the canal might have been prevented by better gates on the Old Crosscut Canal, and by guniting the south bank of the Arizona Canal in the vicinity of Cudia City Wash. Had the canal not broken, less water would have escaped, and with less force. Residents testified to seeing a "wall" of water drive through the area at about the same time the canal's bank eroded and washed out. Although the evidence was conflicting, a jury could find that the flood waters escaping the canal possessed greater volume and greater kinetic force than they would have had absent the Association's negligence, and that this contributed to appellants' injuries.
IV. DID THE COURT ERR IN REFUSING TO ADMIT INTO EVIDENCE PLAINTIFFS' EXHIBIT 76 FOR IDENTIFICATION?
Since we have held that the trial court incorrectly directed a verdict for the Association on the issue of negligence, we must now consider an evidentiary point likely to arise again on re-trial.
Appellants sought to introduce a two page document which purported to show, in graph form, the amounts of rain that fell at various points in the Salt River Valley during the storms of 1939 and 1943. This document (Exhibit 76) was found in the Association's files, and was produced upon appellants' request. The purpose of offering Exhibit 76 was to show that the Association knew, or should have known, that storms similar to the June 1972 storm had occurred with some frequency in the Valley. Upon objection by the Association, Exhibit 76 was excluded.
Appellants first assert that Exhibit 76 was admissible as an ancient document. A document which is (1) approximately 30 years old or more,[7] (2) unsuspicious in appearance or otherwise, and (3) produced from natural and proper custody, is admissible without further proof of authenticity. E.g., Taylor v. Johnston, 289 N.C. 690, 224 S.E.2d 567 (1976); McCormick's Handbook on the Law of Evidence, § 223 (2d ed. 1972). In some jurisdictions statements in ancient documents may be received as proof of the facts recited therein provided the writer would have been competent to testify to those facts. Kirkpatrick v. Tapo Oil Co., 144 Cal. App.2d 404, 301 P.2d 274 (1956); accord, Sherrill v. Estate of Plumley, 514 S.W.2d 286 (Tex.Civ.App. 1974); see also, Rule 803(16), Arizona Rules of Evidence, 17A A.R.S. (effective September 1, 1977); McCormick's Handbook on the Law of Evidence, § 323 (2d ed. 1972). However, despite these two aspects of ancient documents  a rule of authentication and an exception to the hearsay rule  an ancient document is not automatically admissible. Sherrill v. Estate of Plumley, supra. The document must also be relevant and material to the inquiry. See Kirkpatrick v. Tapo Oil Co., supra.
In some circumstances, Exhibit 76 might arguably qualify for admission as an ancient document. We do not find, however, that the trial judge abused his discretion under the circumstances presented in this case by refusing to admit Exhibit 76. See, e.g., Steele v. Vanderslice, 90 Ariz. 277, 367 P.2d 636 (1961); Higgins v. Arizona Savings & Loan Association, 90 Ariz. 55, 365 P.2d 476 (1961); Ogonowski v. Bankers Leasing Corp., 8 Ariz. App. 484, 447 P.2d 576 (1968). Several factors justified the judge's exclusion of this evidence.
There is no date on the document. The Association's Manager of Water Operations, Mr. Friar, testified that Exhibit 76 was found either with a report on the 1939 storm or with the 1943 storm report. Mr. Friar could not say who prepared the document, or for what purpose. He testified that the Association keeps some documents that are not its own. Normally, the Association identifies its own records, but there is no identification on Exhibit 76. Mr. Friar said he could not identify any of the rainmeasuring stations as being in the Cudia City Wash area.
*340 Clearly, there is uncertainty as to whether Exhibit 76 could satisfy the requirements for being an ancient document. No one knows exactly when it was prepared. And since the author and purpose of the document are unknown, it becomes difficult to decide whether Exhibit 76 was found in proper custody  in a place that gives circumstantial evidence that the document is genuine. Even if it is an ancient document, there is no indication that the unidentified author would have been competent to testify to the facts recited in the document.[8] Finally, the probative value of Exhibit 76 is slight, because it is not shown to be an Association document, and it does not relate directly to the rainfall that has been experienced in the Cudia City Wash area.[9]
Appellants also seek to have Exhibit 76 admitted as an admission by the Association, as a business record, or simply because it was found in the Association's files. The exhibit cannot be an admission, since there is no showing that it was made by the Association. It requires no more than a citation to Rule 44(g), Arizona Rules of Civil Procedure, 16 A.R.S. (deleted incident to adoption of the Arizona Rules of Evidence, effective September 1, 1977) to demonstrate that Exhibit 76 was not properly substantiated as a business record, since not one of the necessary elements was satisfied. We decline to hold that mere presence in the Association's records compels admission into evidence.
V. WAS THE TRIAL COURT CORRECT IN DENYING APPELLANTS' REQUEST TO BRING THIS SUIT AS A CLASS ACTION?
Prior to trial of this action, the court entered a "judgment" declaring that this suit could not be maintained as a class action. Plaintiffs filed a notice of appeal from this "judgment", but a stipulation was entered and an order was made dismissing this appeal. Plaintiffs then proceeded in their individual capacities, and now, after final judgment in this case, question the propriety of the dismissal of their class action.
The appellee Association contends that the class action issue may not be urged on appeal. It is the Association's position that the dismissal of the class action was an appealable order when entered, and, no appeal having been consummated within the allowable time, is now res judicata.
Ordinarily, an order granting or denying permission to proceed with a class action is merely interlocutory, and is not final until all issues and parties involved in the lawsuit are finally disposed of.[10]See, e.g., Galvan v. Levine, 490 F.2d 1255 (2d Cir.1973) cert. denied 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). It is true that in some circumstances an order denying leave to proceed with a class action is immediately appealable pursuant to A.R.S. § 12-2101 D.[11]Reader v. Magma-Superior Copper Co., 108 Ariz. 186, 494 P.2d 708 (1972). However, in this case appellants are not precluded from raising the class *341 action issue after final disposition of the lawsuit.
We disagree with the Association's contention that the order dismissing appellants' class action was appealable when entered. It does not appear to fall within the narrow confines of A.R.S. § 12-2101 D. The order did not "in effect" determine the action, nor did it prevent "judgment from which an appeal might be taken", since appellants proceeded in their individual capacities to a final resolution of this litigation.
When a plaintiff's individual claim is small, an order that the litigation may not be maintained as a class action effectively puts an end to the plaintiff's lawsuit. No appellate court would ever get the chance to review whether the action was appropriate for a class suit. In such a case A.R.S. § 12-2101 D, like the federal "death knell" doctrine, would enable the plaintiff to take an immediate appeal from the order denying his class action. Reader v. Magma-Superior Copper Co., supra. But where, as here, the plaintiff pursues his claim to judgment, we hold that the prior order denying leave to proceed as a class becomes merged into the final judgment, and the time for appeal starts to run with the entry of the final judgment. To hold otherwise would force cautious litigants to appeal every class action order, even if they were prepared to remain in the litigation, for fear that the time for appeal may have started to run from the entry of the class action order. This would promote piecemeal appeals, judicial inefficiency, and protracted litigation  evils which the appeals statute and the Rules of Civil Procedure are designed to prevent. See Rule 54(b), Arizona Rules of Civil Procedure, 16 A.R.S.;[12]Stevens v. Mehagian's Home Furnishings, Inc., 90 Ariz. 42, 365 P.2d 208 (1961); Terrazas v. Superior Court, 112 Ariz. 434, 543 P.2d 120 (1975); But cf. Bell v. Beneficial Consumer Discount Co., 465 Pa. 225, 348 A.2d 734 (1975) (indicating that it is better to have all denials of class actions appealed immediately).
Our holding is consistent with federal law on class actions. See cases cited at 3B Moore's Federal Practice ¶ 23.97, at 23-1952, n. 8 (2d ed. 1977). Although the federal appeals statute contains no provision comparable to A.R.S. § 12-2101 D, the federal policy regarding appeals from class action orders is similar. See Reader v. Magma-Superior Copper Co., supra.
The Association also asserts that appellants have no standing to challenge the trial court's refusal to certify their suit as a class action, since appellants, having been allowed to proceed in their individual capacities, were not harmed by the court's ruling. No authorities are cited for this proposition, and the rule appears to be to the contrary. See, e.g., Wright v. Stone Container Corp. 524 F.2d 1058 (8th Cir.1975); Paton v. LaPrade, 524 F.2d 862 (3d Cir.1975), (permitting appeal from class action denial after a disposition unfavorable to the individual plaintiff). See also, Carpinteiro v. Tucson School District No. 1, 18 Ariz. App. 283, 501 P.2d 459 (1972).
We must now determine whether the trial court erred in not permitting appellants' suit to be brought as a class action. If the plaintiff seeks to bring a class action, he bears the burden of showing that his case is appropriate for class action certification. Lennon v. First National Bank of Arizona, 21 Ariz. App. 306, 518 P.2d 1230 (1974). The trial court has discretion whether to allow a suit to be maintained as a class action, and the trial court's decision will not be disturbed on appeal unless an abuse of discretion is shown. Carpinteiro v. Tucson School District No. 1, supra. We do not find an abuse of the trial court's discretion.
*342 The trial court could well have found that it was not impractical to join all members of the class as plaintiffs. However, assuming, without deciding, that appellants met the four prerequisites to a class action enumerated in Rule 23(a), Ariz.Rules of Civil Procedure, 16 A.R.S.,[13] appellants would still have to bring their suit within one of the three categories of maintainable class actions specified in subsection (b) of Rule 23. The present case most closely resembles a (b)(3) class action. To maintain a class action under that subsection, the plaintiff must show that the common questions of law or fact predominate over questions affecting only individual members of the class, and that the class action is superior to other methods of adjudicating the controversy.
Admittedly, there are questions of law and fact which are common to the class, but we do not find them to predominate over the individual questions. Before the Association can be adjudged liable to the class, more must be determined than whether the Association failed to act as a reasonable, prudent person. There are difficult questions of proximate cause.[14] It is possible that some class members are so far removed from the foreseeable zone of danger that the Association breached no duty as to them. There are, conceivably, affirmative defenses (such as superseding cause) applicable to some members of the class. Those Arizona cases which have allowed class actions to proceed have involved claims to which there could be few, if any, individual defenses. See Lennon v. First National Bank of Arizona, supra. This case is not one of those rare mass tort cases where class action status is appropriate because of the absence of affirmative defenses. See Yandle v. PPQ Industries, Inc., 65 F.R.D. 566 (E.D.Tex. 1974). Rather, it falls within the large group of mass accident cases which should not be prosecuted as a class action. Advisory Committee Notes to Rule 23(b)(3) (1966 amendment), Fed.R. Civ.P.; Marchesi v. Eastern Airlines, Inc., 68 F.R.D. 500 (E.D.N.Y. 1975). The individual questions are not subordinate to the common questions.[15] Furthermore, there is no sufficient showing that a class action would be superior to alternative methods of adjudication. This is not a case where the damages suffered by the individual plaintiffs are so slight that they would be unable to bring suit in their individual capacities. See Lennon v. First National Bank of Arizona, supra. The appellants in this case were able to proceed without a class action, and victims of other canal floods have joined to bring individual suits against the Association.
CONCLUSION
The trial court's judgment is reversed and this case is remanded to the superior court for a new trial consistent with this opinion.
NELSON and DONOFRIO, JJ., concur.
NOTES
[1] Appellants also claim that a second natural watercourse  the Arizona Canal  was diverted onto their land. We find no diversion of the Arizona Canal by the Association. In this opinion, infra, we discuss the viability of appellants' diversion theory as it relates to the confluence of the Arizona Canal and Cudia City Wash.
[2] The general rule is that one may not divert a natural watercourse or surface water and cause it to flow upon one's neighbor's land. E.g., Southern Pac. Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81 (1944). However, there is a privilege to protect one's land from flood waters. Id.
[3] For a discussion of the relatively novel application of the natural watercourse doctrine by the Ramada Inns court, see Note, Strict Liability and the Arizona Canal: The Natural Watercourse Evasion, 17 Ariz.L.Rev. 895, 897-902 (1975).
[4] At least insofar as such restrictions contribute to breaks in the canal.
[5] We reject the contention that because the Association undertook some storm control functions it automatically assumed full-scale flood control duties. The Giglio court was aware of the Association's activities regarding storm control, and refused to find an assumption of flood control obligation. Moreover, for policy reasons, we decline to expand the scope of the Association's storm control duties, since this would discourage the use of irrigation facilities for any storm control at all.
[6] While Arizona rejects the Second Restatement's "substantial factor" test of proximate causation, it does so because the word "substantial" implies that the defendant's act must be a "large" or "abundant" cause of plaintiff's damages. In truth, there is liability if the defendant's conduct contributed "only a little" to plaintiff's injuries. McDowell v. Davis, 104 Ariz. 69, 71-72, 448 P.2d 869, 871-72 (1968).
[7] When this case is retried, the presumptive period will be 20 years. Rule 901(b)(8), Arizona Rules of Evidence, 17A A.R.S. (effective September 1, 1977).
[8] We take no position on whether Rule 803(16), Arizona Rules of Evidence, has expanded the common law hearsay exception to admit statements in ancient documents which give no indication that the declarant had personal knowledge of the facts.
[9] We note that some of the data in Exhibit 76 relating to the 1943 storm was cumulative, as rainfall at four of the same locations is recorded in the report on the "Desert Flood of August 4, 1943", admitted into evidence as Exhibit 75.
[10] The Arizona Rules of Civil Procedure do not contemplate that an order allowing or disallowing a class action will be final. Rule 23(c)(1) provides:

"(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."
[11] A.R.S. § 12-2101 D permits an appeal:

"D. From any order affecting a substantial right made in any action when the order in effect determines the action and prevents judgment from which an appeal might be taken."
[12] We do not imply that Rule 54(b) has any application to orders relating to the maintenance of class actions. See Moynahan v. Fritz, 90 Ariz. 144, 367 P.2d 199 (1961). Also, see 10 C. Wright and A. Miller, Federal Practice and Procedure § 2658, at 54 (1973) to the effect that the Federal Rule 54(b) does not apply to orders which are statutorily appealable regardless of finality.
[13] Rule 23(a) provides:

"23(a) Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."
[14] There is precedent for permitting a class action on the single issue of defendant's breach of the standard of care, with issues like proximate causation being deferred for individual determination. See Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558 (S.D.Fla. 1973), aff'd without opinion 507 F.2d 1278 (5th Cir.1975). However, appellants have not suggested to the trial court or to this court that their class action should be limited in this way. Therefore, we conclude that the trial court was within its discretion to deny appellants' requested class action.
[15] We also note that appellants did not move to bifurcate the issues of liability and damages until after their petition for class action was dismissed.