721 P.2d 1154

Colin N. BEALS and Jean Beals, husband and wife; Cheryl B. Larkey, Plaintiffs/Appellants,

v.

STATE of Arizona, Arizona Game & Fish Department, Defendant/Appellee.

T.C. PEARSON and Betty Pearson, husband and wife; Jose Abrigo and Estella Abrigo, husband and wife; Luella Albrecht, individually; William Amator, individually; Albert Andrews and Regina Andrews, husband and wife; Donald Armstrong and Sherran Armstrong, husband and wife; Arrow Auto Parts; Edward Balke and Donna Balke, husband and wife; James Raymond Barber dba West End Trucking and Repair; Albert Bevans, individually; G.F. Bittick, individually; Lois Ann Bohannon, individually; Jean Boutin and Linda Boutin, husband and wife; Edmon R. Breshears, individually; Carrol Brogdon and Lorna Brogdon, husband and wife; Lawrence Brogdon, individually; John Charles Brown, individually; Pauline Brown, individually; Clark Bulliner and Sharon Bulliner, husband and wife; Borden Burleson, individually; Elgie Burleson, Jr., individually; Elgie Burleson, Sr., individually; Frank Bush and Mary Gayle Bush, husband and wife; Ray Cagle dba Cagle Bros., Frank Calhoun, individually; James C. Casey, individually; Juan Chavez and Marian Chavez, husband and wife; Jerold W. Clark, individually; Jack Clemit, individually; Ardene Cormier, individually; William Costianes, individually; Kenneth H. Crow, individually; Jack L. Daly, individually; Evelyn J. Davis, individually; Rosella Davis, individually; Carl W. Deal, individually; Arnold Decker and Jetta Decker, husband and wife; John L. Detrick, individually; Robert Dickey and Rae Dickey, husband and wife; Jip L. Dycus, individually; Allie Edgemon, individually Harold Edgemon and Sandra Edgemon, husband and wife; Carter Robert Ersery, individually; Bert A. Farmer, individually; Milton K. Farmer, individually; Margaret Finnegan, individually; Alan Friend and Florence Friend, husband and wife; Carlos N. Garcia, individually; Elaine L. Glenn, individually; Leonard Graham, individually; Deborah Granillo, individually; Don Greenough, individually; William Haggard and Sons; Haggard and Jonovich; R.E. Hayes and Molly B. Hayes, husband and wife; Ronald Hayes and Partricia Hayes, husband and wife; Louis Henry and Rev. Avel G. Henry, husband and wife; Vernon Hite and Leona Hite, husband and wife; Neil Hoffman dba Hoffman Dairy; Jerald L. Horton, individually; Michael Hoyt and Nancy Hoyt, husband and wife; Charles Jeffries and Betty Jeffries, husband and wife; R.C. Jones and Joy Jones, husband and wife; Raymond E. Keim, Sr. and Jane Doe Keim, husband and wife; Pearl Ketring, individually; Conrad R. Kumler and Patricia Kumler, husband and wife; Richard Lewis and Lillian Lewis, husband and wife; Charles Lichte, Jr. and Mary Ann Lichte, husband and wife; Ethel E. Livesey, individually; Harry McGiness and Mildred McGiness, husband and wife; William L. May, individually; Manuel Morales and Betty Jean Morales, husband and wife; Larry Morgan and Pat Morgan, husband and wife; Ray Morgan and Ruth Morgan, husband and wife; Hyrum (Gene) Nelson and Linda Nelson dba Lindene Enterprises; Lawrence Oliver and Ernestine Oliver, husband and wife; Dorothy O'Neal, individually; James M. O'Reilly and Leolyn M. O'Reilly, husband and wife; Leo Owens and Ruth Owens, husband and wife; Sharon Owens, individually; Dick Panther and Rosemary Panther, husband and wife; John Parker and Mary Ann Parker, husband and wife; Merlin Pearson, individually; George Peck and Addie Lee Peck, husband and wife; Bob Pendley, individually; Huey Pendley, individually; Daril Peterson and Peggy Peterson, husband and wife; Michael Popelier and Bernadette Popelier, husband and wife; Victor Popelier and Vera Popelier, husband and wife; George Power and Mariane Power, husband and wife; Louis Prindle, individually; Raymond Rainey and Mary Lou Rainey, husband and wife;

Zeck Raney, individually; Edward S. Ranshaw, individually; Adron Reichert, individually; George E. Riley, individually; Sherry Riley, individually; Daniel Robinson, individually; James Rogers, individually; John Rohr and Roberta Rohr, husband and wife; James K. Scott and Geraldine Scott, husband and wife; Alfred Shackleford, individually; Garlon E. Shahan, individually; Gene Shelton and Kaylee Shelton, husband and wife; Manuel L. Silvas, individually; George Sokolis and Joyce Sokolis, husband and wife; Morris Splaver dba AMA Auto Salvage; Timothy L. Stanton, individually; Clarence Stegall, individually; Joe C. Stewart, et al.; Mary Lee Stewart, individually; John R. Stokes, individually; Doris Stokes, individually; Gregory Sullivan, individually; Ralph Surber and Beverly Surber, husband and wife; Gerald Swindle and Patricia Swindle, husband and wife; John Treviso, individually; James G. Trout and Christine Trout, husband and wife; Harry Underwood and Ruth Underwood dba Gladtime Farm; Bill Underwood and Tresia Underwood dba Gladtime Farm; Ray Vanosdell & Sons, Inc.; Betty Veazey aka Oliver; Mile Vela and Jane Vela, husband and wife; Joe C. Villalpando, individually; Warren Waddle, individually; Cleo West and Veneta West, husband and wife; Norval White and Louise White, husband and wife; Jerry and Rosella Willingham, husband and wife; Ila Marie Wright, individually; Charles Yarbrough and Debbie Yarbrough, husband and wife; John Childers and Katherine Childers, husband and wife, Plaintiffs/Appellants,

v.

STATE of Arizona, Arizona Game and Fish Department, Defendant/Appellee.

ARLINGTON CANAL COMPANY, an Arizona corporation; Arlington Elementary School District # 47; Gary P. Gable and Carolyn Gable, husband and wife; H.C. Gable and Ethel M. Gable, husband and wife; Warren C. Gable and Alice M. Gable, husband and wife; Eugene Jagow and Betty Jagow, husband and wife; H.A. Kreager and Henrietta Kreager, husband and wife; William L. LaFollette and Susane H. LaFollette, husband and wife; Robert A. Richardson and Alma E. Richardson, husband and wife; Robert A. Richardson, Jr. and Susan Richardson, husband and wife; Sam K. Richardson and Marion Richardson, husband and wife; Willie J. Stogner and Carolyn Stogner, husband and wife; Charles Wayne Vanosdell and Luella R. Vanosdell, husband and wife; Leigh M. Watkins and Nan Watkins, husband and wife; Ralph A. Watkins and Patricia Watkins, husband and wife, Plaintiffs/Appellants,

v.

STATE of Arizona, Arizona Game and Fish Department, Defendant/Appellee.

Nos. 2 CA–CIV 5610, 2 CA–CIV 5630 and 2 CA–CIV 5629.

Court of Appeals of Arizona, Division 2, Department A.

Feb. 13, 1986.

Haralson, Kinerk & Morey, P.C. by Burton J. Kinerk and Denneen L. Peterson, Tucson, Law Offices of Melvin M. Belli by Melvin M. Belli and Richard E. Brown, San Francisco, Cal., Reed W. King, Phoenix, for plaintiffs/appellants.

Winston & Strawn by Michael F. Rollins, Robert P. Simbro & M. Robert Dauber, Phoenix, for defendant/appellee.

## OPINION

HOWARD, Presiding Judge.

This is an appeal from the granting of a summary judgment. The issue here is whether the defendant can be held liable for damages caused by Gila River waters diverted from the river by salt cedar and other natural growth. We hold that it cannot and affirm.

We consider the facts in the light most favorable to the plaintiffs. *Gibraltar Escrow Company v. Thomas J. Grosso, Investment, Inc.*, 4 Ariz.App. 490, 421 P.2d 923 (1966).

Plaintiffs owned 630 acres of farmland immediately adjacent to the Gila River near Buckeye, Arizona. Seventy-one percent of the land is located in the 100-year flood plain of the Gila River. In March and December of 1978 and February of 1980 the plaintiffs' lands were damaged by floodwaters which were diverted onto plaintiffs' properties by vegetation in or near the bed of the Gila River.

The vegetation complained of in this action is comprised almost entirely of "phreatophytes," a diverse group of plants with one characteristic in common, their roots tap shallow ground water, especially such water adjacent to and under rivers. Native phreatophytes, consisting of cottonwood and mesquite trees, arrow weed and salt grass, abounded in and along the Gila River bed in the late 1800's. During the mid-1800's the salt cedar was introduced into the southwest and has since become the predominant phreatophyte growth along the Gila River bed. By 1929 there were "jungles" of salt cedar along the Gila River near Buckeye.

Because of the relatively dense phreatophyte vegetation between the Salt and Gila Rivers and Gillespie Dam, the region, which includes the area of the river bed causing the flooding, has become a valuable wildlife habitat for various birds and other animals. In the early 1950's the Game and Fish Department, pursuant to its statutory powers [1] and in cooperation with the United States Secretary of the Interior acting pursuant to 16 U.S.C. § 661 et seq., purchased 480 acres of land along the Gila River under Federal Aid Project W–63–L with the intent of promoting and preserving Arizona waterfowl. Three years later, on October 1, 1954, the Assistant Secretary of the Interior issued Public Land Order 1015, reserving an additional 6,896 acres for use by the Arizona Game & Fish Commission in connection with Arizona's efforts to establish the Gila River Waterfowl Area Project.

The Arizona Game & Fish Commission and the United States Department of the Interior, through the Fish & Wildlife Service, entered into a cooperative agreement before the state assumed management of the Project. The agreement expressly provided that the various federal lands were being reserved for use by the Arizona Game & Fish Commission "[f]or the purpose of establishing a wildlife management unit to be operated and administered ... as a wildlife refuge, public shooting grounds, or game management area...." The State of Arizona expressly agreed to take such measures as it may deem necessary to prevent the use of the lands for any purpose which is inconsistent or incompatible with

---

1. See A.R.S. § 17–231(B)(2) and (7).

the purposes specified in the agreement. The agreement further provided that if the state abandoned the project or failed to utilize the designated lands for the purposes described in the agreement, the Director of the Fish & Wildlife Service could revoke the state's privileges.

The above lands, the property purchased outright by the Arizona Game & Fish Department and the land reserved under Public Land Order 1015, have been maintained by the Department since the early 1950's. The Department's refusal to allow the destruction of certain portions of the lands formed the basis of plaintiffs' complaint.

Plaintiffs alleged four theories of liability: The strict liability claim (Count One) was based on the alleged fact that the phreatophytes in the Gila River caused the diversion of the natural flow of the stream onto the plaintiffs' property; Count Two (negligence) alleged that the Game & Fish Department was negligent and careless in allowing the phreatophyte growth to continue and in refusing to allow a channel to be cut through the vegetation before the floods of 1978 and 1980; Count Three (inverse eminent domain) alleged the Game & Fish Department's actions in fostering the development of the phreatophyte growth and the resulting flooding of plaintiffs' property amounted to a taking of the property, and Count Four (trespass) alleged that the defendant intentionally and deliberately caused the development of phreatophytes, that the blockage created by the vegetation caused the plaintiffs' property to be flooded, and that the defendant knew the diversion of water onto the plaintiffs' property would cause serious damage. The plaintiffs further alleged in their strict liability claim:

"That by reason of the defendants' actions in originating, encouraging and providing for the development of Salt Cedars within said riverbeds and their refusal to allow interested parties to clear and maintain a proper channel for flows of water through said thickets of Salt Cedars and areas cultivated by the defendant and its agent, the Arizona Game and Fish Department, Salt Cedars were allowed to florish (sic) within the channel of the Salt and Gila Rivers and resulted in the creation of barriers so as to clog and choke the original channels of said rivers and to further cause a rechannelization of said rivers onto plaintiffs' property."

The defendant contends that summary judgment was proper since the salt cedars are natural growth and the Department did nothing to change the natural flow of the Gila River. Plaintiffs contend that there remains a question of fact as to whether the salt cedars are natural growth and that even if they are not, the defendant is liable under theories of strict liability, inverse eminent domain, and trespass. We do not agree with the plaintiffs.

The Restatement (Second) of Torts § 363 (1965) governs this case and relates to defendant's liability under all of the theories advanced by the plaintiffs. It states:

"(1) Except as stated in Subsection (2), neither a possessor of land, nor a vendor, lessor, or other transferor, is liable for physical harm caused to others outside of the land by a natural condition of the land.

(2) A possessor of land in an urban area is subject to liability to persons using a public highway for physical harm resulting from his failure to exercise reasonable care to prevent an unreasonable risk of harm arising from the condition of trees on the land near the highway."

Comment b to § 363 defines the term "natural condition of the land" as follows:

" 'Natural condition of the land' is used to indicate that the condition of land has not been changed by any act of a human being, whether the possessor or any of his predecessors in possession, or a third person dealing with the land either with or without the consent of the then possessor. It is also used to include the natural growth of trees, weeds, and other vegetation upon land not artificially made receptive to them. On the other hand, a structure erected upon land is a non-natural or artificial condition, as are

trees or plants planted or preserved, and changes in the surface by excavation or filling, irrespective of whether they are harmful in themselves or become so only because of the subsequent operation of natural forces."

In his deposition, one of the plaintiffs' expert witnesses stated that the salt cedars in the Gila River were not "natural." Plaintiffs thus contend that there is a question of fact as to the exact legal status of these salt cedars. We do not agree. First of all, it is clear that the witness meant that the salt cedars were not "native" to the area and not that they had been artificially placed there. Second, this testimony was a conclusion based upon no facts. The facts in the case demonstrate beyond argument that the salt cedars came into the area in the mid-1800's. There is no contention that the defendant, or anyone else, planted the salt cedars that are the subject of this lawsuit.

In regard to Comment *b* of § 363, the plaintiffs argue that the acts of the Game & Fish Department in refusing to allow others to clear a channel through the vegetation amounted to a "preservation" of the vegetation, making the vegetation unnatural. We do not agree. The "preservation" envisioned by the comment means some sort of affirmative action on the part of the defendant and not its failure to act.

Consistent with the Restatement and also controlling in this case is the rule that so long as one takes no active steps to change the natural flow of water over or from his premises, whether from streams, springs, or on the surface of the land, he is not chargeable with liability for any injury or damage which may result to an adjoining or lower proprietor from such flow. *Hughes v. Anderson,* 68 Ala. 280, 44 Am. Rep. 147 (1880); *Swett v. Cutts,* 50 N.H. 439, 9 Am.Rep. 276 (1870); 78 Am.Jur.2d Waters § 359 (1975). The plaintiffs contend that even if the defendant had no duty to remove the salt cedars, it had no right to refuse plaintiffs permission to clear the vegetation at their own expense, and such

refusal entitles them to damages. We do not agree.

The case of *Cole v. Bradford,* 52 Ga.App. 854, 184 S.E. 901 (1930), cited by plaintiffs, involved a situation where trees on the defendant's property had become rotten and due to bad weather the branches of the trees had broken off and fallen into the main channel of the water course. This resulted in a curtailment of the flow of water to another riparian owner. The court stated, inter alia, that because of an existing easement resting in the plaintiff upon adjoining lands to have the water flow in its natural quantity from his land, the defendant would, as to such naturally arising obstructions, be bound to permit the plaintiff to enter upon his (the defendant's) land after due notice and at his own expense, clear away such natural arising obstructions from the channel. Furthermore, if the defendant refused to permit the plaintiff, at his own expense, to remove the obstruction an action for damages would lie. The rules stated in *Bradford* are based upon the law of riparian water rights. The doctrine of riparian water rights has been abrogated in the State of Arizona. *Chandler v. Austin,* 4 Ariz. 346, 42 P. 483 (1895). Furthermore, the factual situation in *Bradford,* is inapposite since it involved a right to a continued flow of the water whereas here we have a flood damage suit.

The court in *Bradford,* cites the case of *Parrish v. Parrish,* 21 Ga.App. 275, 94 S.E. 315 (1917). The *Parrish* case involved flood damage but was based upon the common law rule that one who is injured in his riparian rights by a detention of water may recover damages. Again, the common law doctrine of riparian rights is not applicable in Arizona.

Because the defendant has not cast the flood waters upon plaintiffs' properties by artificial means nor by any alteration of the natural water course, the plaintiffs' theories of strict liability, inverse eminent domain and trespass cannot form the basis of liability. *See Ramada Inns, Inc. v. Salt River Valley Water Users' Association,*

111 Ariz. 65, 523 P.2d 496 (1974) (no strict liability for waters escaping from natural water course); *State v. Leeson*, 84 Ariz. 44, 323 P.2d 692 (1958) (conduct which would be tortious if perpetrated by one individual on another may be compensable as a taking in damaging when perpetrated by the state upon an individual); *City of Tucson v. Wondergem*, 6 Ariz.App. 570, 435 P.2d 77 (1968) (action for casting natural flow of a stream onto the land of another who is under no duty to receive it is an action in trespass which is the same as a strict liability.) Since strict liability is inapplicable here, see *Ramada Inns, Inc. v. Salt River Valley Water Users' Association, supra*, there is also no action for trespass.

Affirmed.

HATHAWAY, C.J., and FERNANDEZ, J., concur.